UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| JESUS ELDON ARAGON,<br><br>Plaintiff,<br><br>v.<br><br>LONNIE COLLINGS, an individual, BRIAN DANIELSON, an individual, and DOES 1-10,<br><br>Defendants. | **REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (DOC. NO. 114)**<br><br>Case No. 2:18-cv-00620<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Jesus Eldon Aragon filed suit against Defendants Officer Lonnie Collings and Officer Brian Danielson of the Tooele City Police Department ("TCPD") pursuant to 42 U.S.C. § 1983.[1]  Mr. Aragon's Second Amended Complaint alleges a single claim: use of excessive force.[2]  Mr. Aragon alleges Officers Collings and Danielson used excessive force when they punched him in the head or face during his arrest on April 30, 2014, in violation of his Fourth Amendment rights.[3]

---

[1] (Second Am. Compl., Doc. No. 80.)

[2] (*Id.* ¶¶ 46–57.)

[3] (*Id.*)  In his second amended complaint, Mr. Aragon alleges violations of both the Fourth and Fourteenth Amendment.  (*Id.* ¶ 50.)  However, his opposition to the second motion for summary judgment addresses only the Fourth Amendment.  (Opp'n 17, 29, Doc. No. 116.)  At the hearing held on June 5, 2023, Mr. Aragon clarified he alleges constitutional violations under only the Fourth Amendment.

Officers Collings and Danielson filed a motion for summary judgment on November 16, 2021[4] and Mr. Aragon filed a Rule 56(d) motion in response.[5]  After hearing oral argument, the undersigned magistrate judge recommended the district judge deny the motion for summary judgment without prejudice and grant Mr. Aragon's Rule 56(d) motion in favor of additional discovery.[6]  The district judge adopted that report and recommendation on May 26, 2022.[7]

Now, after conducting additional discovery, Officers Collings and Danielson have brought a second motion for summary judgment.[8]  Relying on their own deposition testimony, bodycam recordings, Mr. Aragon's arrest record, photo evidence, and the TCPD call log from the night in question, Officers Collings and Danielson argue they are entitled to qualified immunity because the undisputed material facts show they did not use excessive force in violation of Mr. Aragon's clearly established constitutional rights.[9]  Mr. Aragon opposes the motion, asserting Officers Collings and Danielson are not entitled to qualified immunity because they violated his clearly established constitutional rights when they used excessive force by punching him in the head or face during his arrest.[10]  Mr. Aragon argues that, at the very least, a

---

[4] (Mot. for Summ. J., Doc. No. 87.)

[5] (*See* Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 92.)

[6] (R. & R., Doc. No. 101.)

[7] (Order Adopting R. & R., Doc. No. 102.)

[8] (Defs.' Second Mot. for Summ. J. ("Second MSJ"), Doc. No. 114.)

[9] (*Id.* at 1–2.)

[10] (Pl.'s Resp. in Opp'n to Defs.' Second Mot. for Summ. J. ("Opp'n") 17, Doc. No. 116.)  In his second amended complaint, Mr. Aragon alleges four instances of excessive force: (1) deployment of pepper balls against him, (2) the use of the police shield in the bathroom, (3) officers punching Mr. Aragon in the head or face in the bathroom, and (4) officers kneeling on Mr. Aragon's back and neck after removing him from the bathroom. (*See* Second Am. Compl. ¶¶ 24–27, 32, Doc. No. 80.)  However, Mr. Aragon's opposition to the second summary

genuine dispute of material fact exists as to the reasonableness of Officers Collings' and Danielson's use of force, which precludes summary judgment.[11]

The court held a hearing on this motion on June 5, 2023.[12]  Where the undisputed facts establish neither Officer Collings nor Officer Danielson violated Mr. Aragon's constitutional rights, Mr. Aragon has failed to rebut their qualified immunity defense.  Accordingly, the undersigned[13] RECOMMENDS the district judge GRANT Officers Collings and Danielson's second motion for summary judgment on the grounds that qualified immunity protects them from suit.

LEGAL STANDARDS

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14]  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit."[15]  "A dispute over a material fact is genuine if a rational jury could find in favor of

---

judgment motion focuses on one alleged instance of excessive force—when Officers Collings and Danielson punched him in the head or face during the bathroom altercation.  (Opp'n 17, Doc. No. 116.)  At the June 5 hearing, Mr. Aragon clarified his excessive force claim focuses on this specific incident, although he relies on the other incidents to the extent they inform the totality-of-the-circumstances evaluation.

[11] (*Id.* at 2.)

[12] (*See* Minute Entry, Doc. No. 127.)

[13] On May 28, 2019, the district judge referred this case to Magistrate Judge Furse under 28 U.S.C. § 636(b)(1)(B).  (Doc. No. 16.)  On May 15, 2020, the case was reassigned to the undersigned magistrate judge.  (Doc. No. 54.)

[14] Fed. R. Civ. P. 56(a).

[15] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted).

the nonmoving party on the evidence presented."[16]  In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."[17]  But "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."[18]

A party asserting a fact cannot be or is genuinely disputed on summary judgment must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[19]

This means "[u]nsupported conclusory allegations [] do not create a genuine issue of fact,"[20] and "mere speculation unsupported by evidence is insufficient to resist summary judgment."[21]

---

[16] *Id.* (internal quotation marks omitted).

[17] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[18] *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

[19] Fed. R. Civ. P. 56(c)(1).

[20] *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000).

[21] *Martinez v. CO2 Servs.,* 12 F. App'x 689, 695 (10th Cir. 2001) (unpublished) (citing *Peterson v. Shanks*, 149 F.3d 1140, 1144–45 (10th Cir. 1998)).

4

RELEVANT FACTS[22]

On April 30, 2014, Tooele City Police Department received a call reporting a burglary in progress from Mr. Aragon's brother, Robert Daniel Aragon ("Robert"),[23] indicating Mr. Aragon had broken into a residence in Tooele, Utah.[24]   Officers Collings and Danielson were among the officers who responded to the call.[25]   Officers Collings and Danielson both wore body cameras which recorded some, but not all, of the following events.[26]

Upon arriving at the residence, Robert informed one of the responding officers, Lieutenant Adrian Day, that Mr. Aragon was not supposed to be inside the residence.[27]   Mr. Aragon initially entered the residence accompanied by two individuals, William Johnson and

---

[22] The court considers the evidence submitted with Officers Collings and Danielson's motion, (Doc. No. 114), Mr. Aragon's opposition, (Doc. No. 116), and Officers Collings and Danielson's reply, (Doc. No. 121).

[23] Because the plaintiff and his brother share a last name, the plaintiff is referred to as "Mr. Aragon" and his brother is referred to as "Robert" throughout this order.  Certain evidence in the record refers to Robert as "Daniel."  (*See, e.g.*, Ex. A to Second MSJ, Arrest Report 5, 8, Doc. No. 114-1.)  However, he is referred to only as "Robert" for purposes of this order.

[24] (MSJ, Statement of Material Facts ("SMF") ¶¶ 1–2, Doc. No. 114 (citing Ex. A to Second MSJ, Arrest Record 8, Doc. No. 114-1; Second Am. Compl. ¶¶ 7–8, Doc. No. 80).)  To the extent Officers Collings and Danielson rely on Mr. Aragon's second amended complaint in support of this (or any other) fact, the court does also.

[25] (Ex. A to Second MSJ, Arrest Record 5, 8, Doc. No. 114-1.)

[26] (Second MSJ, SMF ¶¶ 12–13, Doc. No. 114; Ex. B to Second MSJ, Collings Bodycam Video ("Collings Video"), Doc. No. 114-2 (nonelectronic exhibit on file with the clerk's office); Ex. C to MSJ, Dep. of Lonnie Collings ("Collings Dep.") 97:15–98:3, Doc. No. 114-3; Ex. D to Second MSJ, Danielson Bodycam Video ("Danielson Video"), Doc. No. 114-4 (nonelectronic exhibit on file with the clerk's office); Ex. E to Second MSJ, Dep. of Brian Danielson ("Danielson Dep.") 45:24–25, Doc. No. 114-5.)

[27] (Ex. A to Second MSJ, Arrest Record 7, Doc. No. 114-1.)

Angela Silva, both of whom exited the residence upon officers' arrival.[28]  The residence was owned by Mr. Aragon's mother, Marcella Aragon ("Marcella").[29]  Marcella arrived on the scene and informed officers that Mr. Aragon had been evicted from the residence two weeks earlier and was arrested for trespassing at the residence the night before.[30]  Marcella told police she wanted Mr. Aragon out of the residence.[31]  She also had a signed, ex-parte, protective order, ready to be served on Mr. Aragon.[32]

Robert informed Officer Collings that Mr. Aragon was delusional, had large knives stashed in the residence, and probably had a large knife on him.[33]  An unnamed officer informed Mr. Aragon he was burglarizing the residence and ordered him to come out.[34]  Mr. Aragon

---

[28] (*Id.* at 5, 7–8.)

[29] (*Id.* at 5, 8.)  To avoid confusion, where the plaintiff and his mother share a last name, the plaintiff is referred to as "Mr. Aragon" and his mother is referred to as "Marcella" throughout this order.

[30] (*Id.* at 5, 6, 8.)

[31] (*See id.* at 7; Ex. C to Second MSJ, Collings Dep. 45:1–2, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 41:19–20, Doc. No. 114-5.)

[32] (Ex. A to Second MSJ, Arrest Record 7, 9, Doc. No. 114-1.)

[33] (*Id.* at 8; Ex. C to Second MSJ, Collings Dep. 39:3–20, Doc. No. 114-3.)  Mr. Aragon disputes this fact, arguing the bodycam footage does not capture this conversation with Robert.  (Opp'n 3, Doc. No. 116.)  This dispute is material, but for reasons described in greater detail below, it is not a genuine dispute where Mr. Aragon disputes only this particular witness statement—even though none of the witness statements were captured on video.  Mr. Aragon also objects to this statement as hearsay.  (Opp'n 3, Doc. No. 116.)  However, at the June 5 hearing, Mr. Aragon conceded Robert's statements regarding knives are admissible to show the effect on the listener rather than the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).

[34] (Second MSJ, SMF ¶ 8, Doc. No. 114 (citing Second. Am. Compl. ¶ 15, Doc. No. 80).)  Mr. Aragon disputes officers were at the residence to arrest Mr. Aragon for burglary.  (*See* Opp'n 4, Doc. No. 116.)  This dispute is material, but for reasons discussed below, it is not a genuine dispute where evidence in the record, including evidence submitted by Mr. Aragon, establishes TCPD officers were responding to a burglary in progress.

claims he invited officers into the residence, but officers declined.[35]  Rather than exiting the

residence per officers' commands, Mr. Aragon remained inside the residence and concealed

himself in the attic.[36]  TCPD officers pursued Mr. Aragon into the attic, at which point he fell

through the ceiling and secluded himself in a bathroom.[37]  Before entering the residence, officers

could hear banging from inside the home, leading them to believe Mr. Aragon was damaging the

home.[38]  Meanwhile, Robert and Marcella grew increasingly upset and insisted that officers

remove Mr. Aragon from the residence.[39]

---

[35] (Second MSJ, SMF ¶ 9, Doc. No. 114 (citing Second. Am. Compl. ¶¶ 16–17, Doc. No. 80).)

[36] (Second MSJ, SMF ¶ 10, Doc. No. 114 (citing Second. Am. Compl. ¶ 18, Doc. No. 80; Ex. C to Second MSJ, Collings Dep. 46:18–19, Doc. No. 114-3).)

[37] (Second MSJ, SMF ¶ 11, Doc. No. 114 (citing Second. Am. Compl. ¶¶ 19–22, Doc. No. 80); *see also* Ex. A. to Second MSJ, Arrest Report 7, Doc. No. 114-1.)

[38] (Ex. B to Second MSJ, Collings Video 0:00–0:25, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 41:5–7, 98:11–24, Doc. No. 114-3; Ex. A. to Second MSJ, Arrest Report 5, Doc. No. 114-1.)

[39] (Ex. C to Second MSJ, Collings Dep. 46:20–47:12, 99:4–11, Doc. No. 114-3.)  Officers Collings and Danielson assert Robert and Marcella "repeatedly asked officers" to remove Mr. Aragon from the residence.  (Second MSJ, SMF ¶ 17, Doc. No. 114.)  Mr. Aragon disputes this, arguing no requests of this nature were captured on video.  (Opp'n 5, Doc. No. 116.)  He also contends Officer Collings and Officer Danielson both only had a single conversation with Robert and Marcella, meaning there was no opportunity for them to repeatedly asked for his removal. (Opp'n 5, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 40–43, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 41–44, Doc. No. 114-5).)  However, this does not create a genuine dispute of material fact.  First, it is immaterial how many times officers were asked to remove Mr. Aragon from the residence where the record includes undisputed testimony that Marcella and Robert asked for his removal.  (*See* Ex. C to Second MSJ, Collings Dep. 41:4–5, Doc. No. 114-3 ("Marcella was insistent that we remove [Mr. Aragon] from the home"); *id.* at 40:5 ("[Robert] was insistent we remove his brother from the home"); *id.* at 45:1–2 ("[Marcella] was very upset, very scared, and was demanding that we remove [Mr. Aragon] from the home"); Ex. E to Second MSJ, Danielson Dep. 41:19–20, Doc. No. 114-5 ("[Robert and Marcella] were requesting that [Mr. Aragon] be removed from the home").)  Mr. Aragon has produced no evidence disproving or contradicting this testimony.  Second, the testimony Mr. Aragon cites does not support his position.  (*See* Ex. C to Second MSJ, Collings Dep. 40:10–41:7, Doc. No. 114-3 (indicating Officer Collings had at least two conversations with Robert Aragon); Ex. E to Second MSJ, Danielson Dep. 40–44, Doc. No. 114-5 (indicating Officer Danielson could not

Officers made several attempts to persuade Mr. Aragon to leave the home on his own: ordering him to exit,[40] sending a robot in to inspect the residence,[41] and having Robert speak to Mr. Aragon through the robot in an effort to convince him to leave.[42]  After these attempts failed, officers discussed the "most tactful" way to remove Mr. Aragon from the residence and, ultimately, decided to enter the home.[43]  When officers (including Officers Collings and Danielson) entered the home, they did not know whether Mr. Aragon was armed or what his intentions were.[44]

---

recall whether he had subsequent conversations with Robert Aragon.)  Mr. Aragon also objects to such statements as hearsay, (*see* Opp'n 5, Doc. No. 116), but these statements are admissible to show effect on the listener rather than the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).

[40] (*See* Second MSJ, SMF ¶ 8, Doc. No. 114 (citing Second. Am. Compl. ¶ 15, Doc. No. 80); Ex. C to Second MSJ, Collings Dep. 48:8–9, Doc. No. 114-3).)

[41] (Opp'n, Statement of Add'l Facts ¶ 9, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 41–48, Doc. No. 114-3); *see also* Ex. A to Second MSJ, Arrest Report 5, Doc. No. 114-1.)

[42] (*See* Reply 12, Doc. No. 121 (responding to Mr. Aragon's additional fact regarding the robot being deployed into the residence) (citing Ex. C to Second MSJ, Collings Dep.40:12–23, Doc. No. 114-3); *see also* Ex. A to Second MSJ, Arrest Report 5, Doc. No. 114-1.)

[43] (*See* Second MSJ, SMF ¶¶ 14–15, Doc. No. 114 (citing Ex. B to Second MSJ, Collings Video 0:38; Ex. C to Second MSJ, Collings Dep. 99:4–11, Doc. No. 114-3).)  Mr. Aragon argues the above statement is immaterial, (Opp'n 4, Doc. No. 116), while Officers Collings and Danielson contend it is material.  (Reply 3, Doc. No. 121.)  Either way, there is no genuine dispute with respect to this statement: Mr. Aragon does not dispute the statement was made, nor offer evidence contradicting or disproving the statement.

[44] (Ex. C to Second MSJ, Collings Dep. 48:3–4, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 46:19–47:8, Doc. No. 114-5.)  Mr. Aragon disputes this fact to the extent Officers Collings and Danielson "rely on their *lack of knowledge* that [Mr. Aragon] was armed to support their *belief* that he was armed."  (Opp'n 5–6, Doc. No. 116 (emphasis in original).)  As discussed below, this is not a genuine dispute where Officers Collings and Danielson have presented substantial, uncontradicted evidence establishing that it was reasonable for them to believe Mr. Aragon was armed.

After entering the residence, officers decided to deploy pepper balls into the bathroom where Mr. Aragon had barricaded himself.[45]  Approximately fifty seconds after deploying the pepper balls, Officer Collings can be heard saying "you want some more, or you going to come out?  Jesse, come out."[46]  Mr. Aragon did not comply; he did not leave the bathroom.[47]  Nearly three minutes after deploying the pepper balls and ordering Mr. Aragon out of the bathroom, officers (including Officers Collings and Danielson) entered the bathroom, using a police shield for protection.[48]  At this time, the officers were still unsure whether Mr. Aragon was armed.[49]  Officer Collings first entered the bathroom, holding the shield.[50]

---

[45] (Ex. B to Second MSJ, Collings Video 2:45, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 47:22–48:23, Doc. No. 114-3.)

[46] (Ex. B to Second MSJ, Collings Video 5:18–5:27, Doc. No. 114-2.)

[47] (*Id.* at 5:18–8:10.)

[48] (*See* Ex. B to Second MSJ, Collings Video 8:15, Doc. No. 114-2; Ex. C. to Second MSJ, Collings Dep. 55:24–56:17, 57:4–58:8, Doc. No. 114-3.)  Mr. Aragon disputes the police shield was necessary for protection.  (Opp'n 6–7, Doc. No. 116.)  Although this dispute is material because it is relevant to the reasonableness of the officers' belief that Mr. Aragon was a threat to their safety, it is not genuine.  Mr. Aragon only relies on omissions in the record to support his position, which is insufficient to resist summary judgment.  *See* Fed. R. Civ. P. 56(c)(1); *Martinez*, 12 F. App'x at 695 (citing *Peterson*, 149 F.3d at 1144–45).  He fails to identify evidence which contradicts or disproves this testimony from Officer Collings.  (*See* Ex. C to Second MSJ, Collings Dep. 56:8–10, Doc. No. 114-3.)

[49] (Ex. B to Second MSJ, Collings Video 6:15, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 48:3–18, Doc. No. 114-3.)  Again, Mr. Aragon disputes this fact to the extent Officers Collings and Danielson "rely on their *lack of knowledge* that [Mr. Aragon] was armed to support their *belief* that he was armed."  (Opp'n 5–6, Doc. No. 116 (emphasis in original).)  As discussed in greater detail below, this is not a genuine dispute where Officers Collings and Danielson have presented substantial, uncontradicted evidence establishing that it was reasonable for them to believe Mr. Aragon was armed.

[50] (*See* Ex. C to Second MSJ, Collings Dep. 56:8–10, Doc. No. 114-3.)

Led by Officer Collings, officers entered the bathroom and put the police shield over the top of Mr. Aragon, who was in the bathtub, in an effort to prevent him from attacking with potential weapons.[51]  Officer Collings observed a hammer or mallet of some sort, a drill bit (which he testified was fashioned into a shiv), and other objects in the bottom of the bathtub alongside Mr. Aragon.[52]  A struggle ensued.[53]  According to Officers Collings and Danielson, Mr. Aragon "screamed and thrashed violently while aggressively resisting commands to produce his hands for arrest and stop resisting."[54]  They also contend Mr. Aragon rolled towards the hammer and drill bit, which made Officer Collings nervous.[55]  Mr. Aragon concedes he

---

[51] (Ex. B to Second MSJ, Collings Video 8:15, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 59:23–60:17, 68:2.)  Mr. Aragon raises disputes about the size and use of the shield. (Opp'n 10, Doc. No. 116.)  However, these disputes are relevant only to the extent they inform the totality-of-the-circumstances evaluation, where Mr. Aragon clarified at the June 5 hearing that he does not allege the use of the shield specifically constituted excessive force.

[52] (Ex. C to Second MSJ, Collings Dep. 59:23–60:17, Doc. No. 114-3.)  Mr. Aragon disputes Officer Collings observed a hammer or drill bit in the bathtub.  (Opp'n 8, Doc. No. 116.)  While this fact is relevant to the reasonableness of the officers' belief that Mr. Aragon was a threat to their safety, it is not a genuine dispute where Mr. Aragon relies on omissions in the record to support his position, which is insufficient to resist summary judgment.  *See* Fed. R. Civ. P. 56(c)(1); *Martinez*, 12 F. App'x at 695 (citing *Peterson*, 149 F.3d at 1144–45).  While Mr. Aragon argues Officer Danielson did not know about the hammer and drill bit until after Mr. Aragon was in custody, (*see* Opp'n 9, Doc. No. 116 (citing Ex. E to Second MSJ, Danielson Dep. 67–68, Doc No. 114-5)), this does not create a genuine dispute of fact where it does not disprove, or even contradict, Officer Collings' testimony.  (*See* Ex. C to Second MSJ, Collings Dep. 59:23–60:17, Doc. No. 114-3.)

[53] (*See* Ex. B to Second MSJ, Collings Video 8:13–9:40, Doc. No. 114-2.)

[54] (Second MSJ, SMF ¶ 31, Doc. No. 114 (citing Ex. B to Second MSJ, Collings Video 8:19–9:05, Doc. No. 114-2).)

[55] (Ex. C to Second MSJ, Collings Dep. 66:7–19, Doc. No. 114-3.)

screamed and moved beneath the shield, but denies acting violently or aggressively resisting arrest.[56]  This dispute is addressed in depth below.

During the bathroom struggle, Mr. Aragon grabbed Officer Danielson's arm.[57]  Officer Danielson yelled "let go of me" and commanded Mr. Aragon to stop resisting.[58]  In response to Mr. Aragon grabbing Officer Danielson, both Officer Collings and Officer Danielson punched Mr. Aragon in the head or face with their fists.[59]  According to both officers, they struck Mr. Aragon out of fear that he would gain control of Officer Danielson's rifle or otherwise cause

---

[56] (Opp'n 10, Doc. No. 116 (citing Ex. B to Second MSJ, Collings Video 8:17–9:34, Doc. No. 114-2; Ex. D to Second MSJ, Danielson Video 5:42–7:00, Doc. No. 114-4).)

[57] (Ex. B to Second MSJ, Collings Video 9:05, Doc. No. 114-2; *see also* Ex. A to Second MSJ, Arrest Record 6, 8–9, Doc. No. 114-1; Ex. C to Second MSJ, Collings Dep. 70:1–24, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:7–11, Doc. No. 114-5.)

[58] (Ex. B to Second MSJ, Collings Video 9:05, Doc. No. 114-2; *see also* Ex. A to Second MSJ, Arrest Record 6, 8–9, Doc. No. 114-1; Ex. C to Second MSJ, Collings Dep. 70:1–24, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:7–11, Doc. No. 114-5.)

[59] (Ex. C to Second MSJ, Collings Dep. 71:2–23, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:7–20, Doc. No. 114-5.)  Mr. Aragon disputes any articulation of this event suggesting Officers Collings and Danielson each struck him only once.  (Opp'n 10, Doc. No. 116.)  But this does not create a genuine dispute of fact where Officers Collings and Danielson never claim to have struck Mr. Aragon only once.  (Ex. C to Second MSJ, Collings Dep. 71:6–7, Doc. No. 114-3 ("I struck Mr. Aragon in the face twice with my left hand."); Ex. E to Second MSJ, Danielson Dep. 64:15–19, Doc. No 114-5 ("So as [Mr. Aragon] has his grip on me, I strike him.  It was in the face, head area. And I can't tell you how many times that happened.  But I can tell you as soon as he let go, that stopped.").)

harm to Officer Danielson.[60]  Officers Collings and Danielson testified they stopped hitting Mr. Aragon as soon as he released Officer Danielson's arm.[61]

Officers eventually removed the shield from the bathtub, handcuffed Mr. Aragon, and took him to the front room of the residence.[62]  Nearly a minute and a half passed from the time officers breached the bathroom to when they handcuffed Mr. Aragon.[63]  According to Officers Collings and Danielson, once in the front room, Mr. Aragon continued to resist and disregard

[60] (Ex. E to Second MSJ, Danielson Dep. 64:7–20, Doc. No. 114-5; *see also* Ex. C. to Second MSJ, Collings Dep. 71:2–7, Doc. No. 114-3.)  Mr. Aragon disputes that he was trying to gain control of Officer Danielson's rifle, that the presence of the rifle made it reasonable for the officers to punch him, and that the rifle was the actual reason Officers Collings and Danielson punched him.  (Opp'n 10, Doc. No. 116.)  While the reasonableness of the officers' strikes is material, Mr. Aragon's arguments fail to create genuine disputes of fact where undisputed evidence indicates the rifle was one of many safety concerns for Officers Collings and Danielson, as explained below.

[61] (*See* Ex. C to Second MSJ, Collings Dep. 71:6–20, 74:20–24, 110:15–16, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:15–19; 78:23–79:3, Doc. No 114-5.)  While Mr. Aragon argues a reasonable jury could find "the punches continued after Mr. Aragon was subdued," (Opp'n 26, Doc. No. 116), he fails to cite supportive evidence.  This is insufficient to create a genuine dispute of fact.

[62] (*See* Ex. B to Second MSJ, Collings Video 9:00–10:30, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 70:1–6, 81:9–82:1, 83:6–15, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:4–20, 79:15–21, Doc. No. 114-5.)

[63] (Ex. B to Second MSJ, Collings Video 8:13–9:40, Doc. No. 114-2.)

12

commands, which required several officers, including Officer Collings, to restrain him.[64]  Mr.

Aragon was ultimately transported to jail.[65]

ANALYSIS

Mr. Aragon brings suit under 42 U.S.C. § 1983.[66]  Section 1983 permits a plaintiff to sue

state officials who violate her constitutional or federally protected rights.[67]  Officers Collings and

Danielson claim they are shielded by qualified immunity and are, therefore, entitled to summary

judgment.[68]  The doctrine of qualified immunity protects government officials "from civil

liability so long as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."[69]  It provides broad protection,

shielding "all but the plainly incompetent or those who knowingly violate the law."[70]  Qualified

immunity operates as immunity from suit, rather than a simple defense to liability.[71]  When a

---

[64] (*See* Ex. B to Second MSJ, Collings Video 10:30, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 83:9–84:18, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 80:22–81:9, Doc. No. 114-5.)  Mr. Aragon disputes various aspects of the events which occurred in the front room of the residence.  Specifically, Mr. Aragon disputes that he continued resisting and disregarding lawful commands.  He also disputes any contention that his breathing was unencumbered while he was restrained on the floor.  (*See* Opp'n 11–12, ¶¶ 36–38, Doc. No. 116.)  However, all disputes related to these events are relevant only to the extent they inform the totality-of-the-circumstances evaluation, where Mr. Aragon clarified at the June 5 hearing that he does not allege the events in the front room specifically constituted excessive force.

[65] (*See* Ex. C to Second MSJ, Collings Dep. 95:25–96:2, Doc. No. 114-3.)

[66] (Second Am. Compl., Doc. No. 80.)

[67] *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013).

[68] (Second MSJ 9, Doc. No. 114.)

[69] *Crowson v. Wash. Cnty. State of Utah*, 983 F.3d 1166, 1177–78 (10th Cir. 2020) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

[70] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[71] *See Pearson v. Callahan*, 555 U.S. 223, 237 (2009).

13

section 1983 defendant asserts qualified immunity, the burden shifts to the plaintiff who must demonstrate: (1) the officers' alleged conduct violated a constitutional right which was (2) clearly established at the time of the violation, such that "every reasonable official would have understood[] that such conduct constituted a violation of that right."[72]  If a plaintiff's claim fails on either prong, qualified immunity protects the defendant from suit.[73]

For reasons explained below, the undisputed material facts show Mr. Aragon has failed to establish Officer Collings or Officer Danielson violated his clearly established constitutional rights.  As such, Officers Collings and Danielson are shielded by qualified immunity and are entitled to summary judgment.

## I.  Violation of a Constitutional Right

Mr. Aragon alleges Officers Collings and Danielson violated his Fourth Amendment right to be free from excessive force without justification.[74]  Claims that "law enforcement officers have used excessive force . . . in the course of an arrest" are analyzed under the Fourth Amendment's "reasonableness" standard.[75]  "[A] particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"[76] because officers often have "to make split-second judgments in uncertain and dangerous

---

[72] *Crowson*, 983 F.3d at 1178 (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)).

[73] *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

[74] (Second Am. Compl. ¶ 50, Doc. No. 80.)

[75] *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

[76] *Id.* at 396.

circumstances."[77]  Reasonableness is evaluated "under a totality of the circumstances approach,"

"pay[ing] careful attention to the facts and circumstances of [each] particular case."[78]

Three factors, known as the *Graham*[79] factors, guide the Fourth Amendment

excessive-force analysis: (1) the severity of the crime at issue, (2) whether the subject posed an

immediate threat to the safety of the officers, and (3) whether the subject was actively resisting

or evading arrest.[80]  In addition, courts may also consider a subject's mental health.[81]  Because

the undisputed facts show all three *Graham* factors weigh against him, and the mental-health

factor is neutral, Mr. Aragon has failed to satisfy his burden of establishing Officers Collings and

Danielson violated his constitutional rights under the Fourth Amendment.  Each factor is

addressed below.

a.   *Severity of the Crime*

According to the Tenth Circuit, the first *Graham* factor—severity of the crime—"may

weigh against the use of significant force if the crime at issue is a misdemeanor."[82]  Mr. Aragon

contends this factor weighs in his favor because TCPD officers were at the residence on the night

in question to arrest him for trespassing: a misdemeanor under Utah law.[83]  Conversely, Officers

---

[77] *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005)).

[78] *Id.*

[79] *Graham v. Connor*, 490 U.S. 386 (1989).

[80] *Surat v. Klamser*, 52 F.4th 1261, 1274 (10th Cir. 2022); *see also Graham*, 490 U.S. at 396.

[81] *See Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1190–91 (D. Utah 2012) (citing *Giannetti v. City of Stillwater*, 216 F. App'x 756, 764 (10th Cir. 2007) (unpublished)).

[82] *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018).

[83] (*See* Opp'n 18, Doc. No. 116); *see also* Utah Code Ann. § 76-6-206(3)(b).

Collings and Danielson argue this factor weighs against Mr. Aragon because TCPD officers were at the residence on the night in question responding to a "burglary in progress": a felony.[84] While this dispute is material, it is not a genuine dispute because the evidence Mr. Aragon presents does not contradict the evidence presented by Officers Collings and Danielson.[85] For example, Officers Collings' and Danielson's testimony[86] and the arrest report from the night in question refer to the incident as a "burglary" or "burglary in progress."[87] Further, the TCPD call log from the night in question categorizes the incident as a "BURGLARY-IN P."[88] Even the affidavit of probable cause submitted as evidence by Mr. Aragon supports Officers Collings' and Danielson's position, stating, "Tooele City Officers responded to . . . a burglary in progress."[89]

Mr. Aragon contends Officer Collings' testimony indicating the officers' "goal was to remove Mr. Aragon from the house because his mother and brother insisted he be removed—not because the officers were concerned about Mr. Aragon being violent"—undermines the officers' claims about the severity of the crime.[90] However, Mr. Aragon's representation of Officer

---

[84] (*See* Reply 15, Doc. No. 121); *see also* Utah Code Ann. § 76-6-202(3)(b).

[85] (*Compare* Ex. A to Opp'n, Aff. of Probable Cause, Doc. No. 120 at 2, *with* Ex. A to Second MSJ, Arrest Report 4–5, 8, Doc. No. 114-1 *and* Ex. G to Reply, April 30, 2014, TCPD Call Log ("Call Log") 1, 3, Doc. No. 121-2.)

[86] (*See* Ex. C to Second MSJ, Collings Dep., 35:19–24, Doc. No. 114-3 ("Q: [W]hy were you sent out there?  A: We were called for a burglary in progress.  Q: Any other reason why you were told to go out there?  A: I was told that there were people burglarizing a home.").

[87] (Ex. A to Second MSJ, Arrest Report 4–5, 8, Doc. No. 114-1.)

[88] (Ex. G to Reply, April 30, 2014, TCPD Call Log ("Call Log") 1, 3, Doc. No. 121-2.)

[89] (Ex. A to Opp'n, Aff. of Probable Cause, Doc. No. 120 at 2.)

[90] (Opp'n 18–19, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 41–48, Doc. No. 114-3).)

Collings' testimony is incomplete and inaccurate.  Officer Collings also testified Marcella (the owner of the residence) "said she had a protective order against [Mr. Aragon] because he was violent" and "was afraid of him";[91] "[Robert] said [Mr. Aragon] ha[d] knives stashed around the house and most likely ha[d] a knife on his person";[92] and "[Marcella] was afraid of [Mr. Aragon] and could not have him in her home."[93]  Considered in totality, these statements support a finding that the officers believed they were responding to a serious crime.

Moreover, Officer Collings' testimony must be considered alongside other events from that night.  For example, after arriving at the scene, officers were informed Mr. Aragon had already been removed from the residence for trespassing on a prior occasion.[94]  Marcella was adamant that Mr. Aragon be removed from the house,[95] and informed officers that she had a signed protective order against Mr. Aragon.[96]  And TCPD officers could hear banging inside the residence, leading them to believe Mr. Aragon was actively damaging the home.[97]  Where Mr. Aragon has failed to present evidence contradicting the evidence produced by Officers Collings and Danielson, and considering the totality of the circumstances, the severity-of-the-crime factor weighs against Mr. Aragon.

---

[91] (Ex. C to Second MSJ, Collings Dep. 43:25–44:2, Doc. No. 114-3.)

[92] (*Id.* at 42:15–16.)

[93] (*Id.* at 44:11–14.)

[94] (*See* Ex. A to Second MSJ, Arrest Record 5–8, Doc. No. 114-1.)

[95] (*See* Ex. C to Second MSJ, Collings Dep. 41:4–7, 45:1–2, Doc. No. 114-3.)

[96] (*See* Ex. A to Second MSJ, Arrest Record 7, 9, Doc. No. 114-1.)

[97] (Ex. B to Second MSJ, Collings Video 0:00-0:25, Doc. No. 114-2; Ex. C to Second MSJ, Collings Dep. 46:20–47:9, 98:11–24, Doc. No. 114-3.)

### b.  *Immediate Threat to Officer Safety*

The second factor, whether the subject posed "an immediate threat to the safety of the officer[s] or others" is "undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."[98]  While courts should consider "whether the officers were in danger at the precise moment that they used force,"[99] totality of the circumstances remains the touchstone.[100]  Indeed, "[s]trict reliance on the 'precise moment' factor is inappropriate when the totality must be considered"[101] and a "reasonable but mistaken belief that the suspect is likely to fight back [will] justif[y] using more force than is actually needed."[102]

Relying on deposition testimony, Officers Collings and Danielson argue Mr. Aragon posed an immediate threat to the officers, based on the totality of the circumstances.[103]  Officers Collings and Danielson contend the following justified the belief that Mr. Aragon was a threat, making the force they used against him reasonable:

- Robert's statements to police indicating Mr. Aragon likely had a knife on his person or knives stashed throughout the house,[104]

---

[98] *Surat*, 52 F.4th at 1275 (internal quotation marks omitted).

[99] *Thomson*, 584 F.3d at 1315.

[100] *See id.* at 1318.

[101] *Id.* (internal quotation marks omitted).

[102] *Id.* at 1315.

[103] (Reply 16–17, Doc. No. 121.)

[104] (Ex. C to Second MSJ, Collings Dep. 48:1–18; 23:22–24, 60:9–16, Doc. No. 114; Ex. E to Second MSJ 27:1–11, 31:7–8, Doc. No. 114-5; Ex. A to Second MSJ, Arrest Record 8, Doc. No. 114-1.)  Mr. Aragon disputes that Robert made these statements to TCPD officers because this conversation does not appear on any of the bodycam footage.  (Opp'n 21, Doc. No. 116.)  But

- Officer Collings' testimony that he saw a hammer and drill bit fashioned into a shiv in the bathtub next to Mr. Aragon,[105] and

- the bathroom struggle where Mr. Aragon thrashed violently and grabbed Officer Danielson's arm.[106]

Officers Collings and Danielson also rely on evidence showing they first exhausted other means of lesser force to extract Mr. Aragon from the residence. They argue these facts informed Officers Collings' and Danielson's decisions to strike Mr. Aragon in the head until he released Officer Danielson.[107] Further, they contend that as soon as Mr. Aragon let go, the punching stopped.[108]

Relying on excerpts of Officers Collings' and Danielson's deposition testimony and Officer Collings' bodycam footage, Mr. Aragon argues he did not pose an immediate threat because he was trapped in the bathtub,[109] he was unarmed during the arrest,[110] he never indicated

---

this does not create a genuine dispute of material fact where none of the witnesses' interviews were captured on the bodycam footage. Despite this, Mr. Aragon does not dispute the officers' conversations with all witnesses, just this statement from this particular witness.

[105] (Ex. C to Second MSJ, Collings Dep. 60:8–9, Doc. No. 114-3.)

[106] (*Id.* at 60:15–17, 62:18–22, 71:2–7.)

[107] (*See* Reply 16–17, Doc. No. 121.)

[108] (Ex. C to Second MSJ, Collings Dep. 71:6–20, 110:15–16, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 64:15–19; 78:23–79:3, Doc. No 114-5.)

[109] (Opp'n, Statement of Add'l Facts ¶ 23, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 72, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 74, Doc. No. 114-5; Ex. B to Second MSJ, Collings Video 8:17–9:34, Doc. No. 114-2; Ex. D to Second MSJ, Danielson Video 5:42–7:00, Doc. No. 114-4).)

[110] (Opp'n 21, Doc. No. 116 (citing Ex. E to Second MSJ, Danielson Dep. 82–83, Doc. No. 114-5 (stating no weapons were found on Mr. Aragon once he was patted down).)

he was armed, officers never asked him if he was armed,[111] officers did not discuss amongst themselves whether he was armed, [112] and Officer Collings did not warn the other officers about the objects in the bathtub.[113]  But the evidence offered by Mr. Aragon is unconvincing in that he relies on omissions in the record instead of citing to "particular parts of materials in the record" to rebut Officers Collings and Danielson's evidence.[114]  By doing so, he has failed to create any genuine dispute of fact.  Mr. Aragon's assertions constitute "mere speculation unsupported by evidence," which is insufficient to resist summary judgment.[115]  Further, even the record evidence Mr. Aragon relies on—the excerpts of testimony and bodycam footage—do not contradict the evidence presented by Officers Collings and Danielson.[116]

---

[111] (Opp'n 21, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 59–60, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 61, Doc. No. 114-5).)  Mr. Aragon cites the portion of Officer Collings' testimony stating Officer Collings could not "recall if anybody asked [Mr. Aragon] if he had a weapon," and explaining, "[w]e typically don't make decisions based on [] them saying yes or . . . people tell us 'I don't have anything on me' all the time, and they do often.  So[,] we proceed with the belief that there is a weapon in there, and we're afraid to find out what it is."  (Ex. C to Second MSJ, Collings Dep. 59:6–16, Doc. No. 114-3.)  Similarly, in the cited portion of Officer Danielson's testimony, he simply states he could not recall whether Mr. Aragon indicated he had weapons before officers entered the bathroom.  (*See* Ex. E to Second MSJ, Danielson Dep. 60:14–16, Doc. No. 114-5.)  These statements do not support Mr. Aragon's position.

[112] (Opp'n 21, Doc. No. 116 (citing Ex. E to Second MSJ, Danielson Dep. 60, 67–68, Doc. No. 114-5; Ex. B to Second MSJ, Collings Video, Doc. No. 114-2; Ex. D to Second MSJ, Danielson Video, Doc. No. 114-4).)

[113] (Opp'n 22, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 71, Doc. No. 114-3; Ex. E to Second MSJ, Danielson Dep. 67–68, Doc. No. 114-5; Ex. B to Second MSJ, Collings Video 8:17–9:34, Doc. No. 114-2; Ex. D to Second MSJ, Danielson Video, 5:42–7:00, Doc. No. 114-4).)

[114] Fed. R. Civ. P. 56(c)(1).

[115] *Martinez*, 12 F. App'x at 695 (citing *Peterson*, 149 F.3d at 1144–45).

[116] *See, e.g.*, *supra* n.52, n.111.

Next, relying on portions of Officer Collings' testimony, Mr. Aragon argues he was not a threat because neither Mr. Johnson nor Ms. Silva (individuals inside the residence with Mr. Aragon) indicated he was armed.[117]  But this argument is unavailing where the portions of Officer Collings' testimony cited by Mr. Aragon do not support this contention.  A full reading of Officer Collings' testimony reveals Mr. Johnson and Ms. Silva could not be expected to have made affirmative representations as to whether Mr. Aragon had weapons because they were never asked that question.[118]

Next, Mr. Aragon contends Officers Collings' and Danielson's differing reasons for why they believed Mr. Aragon was a threat belies any assertion that he was a threat.[119]  Mr. Aragon argues Officer Collings believed Mr. Aragon was a threat in response to the hammer and drill bit in the bathtub,[120] while Officer Danielson was concerned Mr. Aragon would gain access to his rifle.[121]  This argument is unpersuasive where undisputed evidence indicates the hammer, drill

---

[117] (Opp'n 21, Doc. No. 116 (citing Ex. C to Second MSJ, Collings Dep. 37–38, 46, Doc. No. 114-3).)

[118] (Ex. C to Second MSJ, Collings Dep. 38:21–25 ("Q: Did [Mr. Johnson] say anything about whether or not Mr. Aragon or Ms. Silva had any weapons?  A: I don't believe [Mr. Johnson] said that, no.  Q: Did you ask?  A: No.").)

[119] (Opp'n 22–23, Doc. No. 116)

[120] (*Id.* (citing Ex. C to Second MSJ, Collings Dep. 61, Doc. No. 114-3).)

[121] (*Id.* (citing Ex. E to Second MSJ, Danielson Dep. 73, Doc. No. 114-5).)  Mr. Aragon disputes that he was trying to gain control of Officer Danielson's rifle, that the presence of the rifle made it reasonable for the officers to punch him, and that the rifle was the actual reason Officers Collings and Danielson punched him.  (Opp'n 10, Doc. No. 116.)  But Mr. Aragon either relies on incomplete, selective portions of evidence which do not disprove, or even contradict, the evidence offered by Officers Collings and Danielson, or fails to cite supportive evidence altogether.  (*Compare id.* (omitting relevant portions of Officer Danielson's testimony), *with* Ex. E to Second MSJ, Danielson Dep. 76:10–17, Doc. No. 114-5 ("Q: Do you have any reason to believe that Mr. Aragon was actually reaching for your rifle?  A: I never said he was reaching for my rifle.  My worry was he was going to pull me into the tub, which would give him access to

bit and rifle, standing alone, were not Officers Collings' or Danielson's only safety concerns. Indeed, the officers' testimony is replete with concerns stemming from Robert's statement indicating Mr. Aragon might be armed with knives.[122] Further, the officers' concerns need not be identical; their concerns would necessarily be based on their own observations. The officers' individual concerns inform the reasonableness of their distinct actions.

Lastly, Mr. Aragon argues his situation is analogous to that in *Surat v. Klamser*.[123] He contends, like in *Surat*, he was at a physical disadvantage to the officers, he was unarmed and outnumbered, and he did nothing more than grab Officer Danielson's wrist while he was in a vulnerable position.[124] But Mr. Aragon's reliance on *Surat* is misplaced. In *Surat*, a 200-pound male officer grabbed the wrist of a 115-pound female after she tried to walk away from him.[125] After "attempt[ing] to pry" her wrist from the officer's grip and "paw[ing]" at his arms, the officer threw her to the ground, causing a concussion, cervical spine strain, contusions to her

---

that rifle. Q: But you don't know if he saw your rifle? A: I have no idea. I can't speak for him. So, yeah, I don't know.").)

[122] (*See, e.g.*, Ex. C to Second MSJ, Collings Dep. 48:3–9, Doc. No. 114-3 ("I personally didn't want to be stabbed. I didn't want my guys to be stabbed. We didn't want to cause him harm. I was concerned about all of us going in there with him having a weapon."); *id.* at 56:6–7 ("I was very concerned about being stabbed. I was concerned about him having weapons."); *id.* at 78:4–9 ("I was under the impression or knew that [Mr. Aragon] had a propensity for violence. I was told that he has been violent, that he is unpredictable."); Ex. E to Second MSJ, Danielson Dep. 47:2–8, Doc. No. 114-5 ("Robert was telling us that he had knives and had been stashing them around the house, [and] giving us [] warning to be careful."); *id.* at 64:12 (expressing general safety concerns "as just a regular officer in there"); *id.* at 59:25–60:7 ("Q: [D]id you perceive that Mr. Aragon was a threat to any of the officers before going into the bathroom? . . . A: My perception is he is a dangerous person, and I'm always more cautious when dealing with him.").)

[123] 52 F.4th 1261 (10th Cir. 2022).

[124] (*See* Opp'n 23, Doc. No. 116.)

[125] *Surat*, 52 F.4th at 1267.

face, and bruising on her arms, wrists, knees, and legs.[126]  Mr. Aragon's situation is distinguishable.  There was not the same size disparity, the officers had ample reason to believe Mr. Aragon might be armed, Mr. Aragon grabbed an officer's wrist (not the other way around), and officers were engaged in a minute-and-a-half long struggle with Mr. Aragon in tight quarters—circumstances which did not exist in *Surat*.

Viewing the totality of the circumstances, the undisputed facts show it was objectively reasonable for officers to believe Mr. Aragon was an immediate threat to their safety.  This reasonable belief started with Robert's statements to officers regarding the likelihood of Mr. Aragon having knives on his person or hidden throughout the house.  The belief was enhanced when Marcella indicated Mr. Aragon was violent, Officer Collings saw items in the bathtub which could be used as weapons, and Officer Danielson's rifle was in close proximity to a struggling subject.  The reasonable belief that Mr. Aragon posed a threat reached its peak when Mr. Aragon grabbed Officer Danielson's arm during the bathroom struggle.  In that moment, considering all the surrounding circumstances, it was objectively reasonable for Officers Collings and Danielson to believe Mr. Aragon was an immediate threat and to act to stop the threat.  Accordingly, the second *Graham* factor weighs against Mr. Aragon.

### c.   Resisting or Evading Arrest

The touchstone for the third *Graham* factor—whether the subject was resisting or evading arrest—is still reasonableness.[127]  "Officers are permitted to use a greater degree of force when they reasonably believe that a suspect is resisting arrest . . . even if that belief is

---

[126] *Id.*

[127] *See Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020) (stating "[t]he *Graham* test asks if the officers' actions were objectively reasonable" within the context of the third factor (internal quotation marks omitted)).

mistaken—as long as the mistake is reasonable."[128]  For instance, "briefly delivering several blows that objectively reasonable officers could have intended as compliance strikes to subdue a struggling suspect and effectuate an arrest—does not amount to an unreasonable seizure within the meaning of the Fourth Amendment."[129]

Officers Collings and Danielson argue this factor weighs against Mr. Aragon because he resisted arrest throughout his entire interaction with TCPD officers.[130]  They contend Mr. Aragon's resistance began when he refused to exit the residence, contrary to officers' commands.[131]  It continued when he refused to come out of the bathroom after pepper balls were deployed[132] and with his struggle in the bathroom and front room.[133]  Officers Collings and

---

[128] *Tanner v. San Juan Cnty. Sheriff's Office,* 864 F. Supp. 2d 1090, 1148 (D.N.M. 2012) (citing *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)).

[129] *Hall v. Brown*, No. 2:20-cv-674, 2022 U.S. Dist. LEXIS 156682, at *13–14 (D. Utah. Aug. 29, 2022) (unpublished).

[130] (*See* Reply 18, Doc. No. 121.)

[131] (Ex. C to Second MSJ, Collings Dep. 40:12–23, 52:1–54:19, Doc. No. 114-3 (describing failed attempts to remove Mr. Aragon from the residence); Ex. E to Second MSJ, Danielson Dep. 47:17–25, 51:8–19; 54:19–55:2 (describing failed attempts to remove Mr. Aragon from the residence).)

[132] (Ex. B to Second MSJ, Collings Video 5:18–5:27, Doc. No. 114-2.)

[133] (*See* Reply 18, Doc. No. 121; Ex. B to Second MSJ, Collings Video 8:14–9:05, Doc. No. 114-2 (depicting the bathroom struggle); Ex. C to Second MSJ, Collings Dep. 66–71, Doc. No. 114-3 (describing the bathroom struggle and recalling Mr. Aragon was "not complying at all" and "actively fighting"); *id.* at 83:15–21 (describing Mr. Aragon's resistance after being removed to the front room of the residence); Ex. E to Second MSJ, Danielson Dep. 63:10–64:20, Doc. No. 114-5 (describing the bathroom struggle and recalling Mr. Aragon was "kicking, thrashing, rolling").)

Danielson contend the bodycam footage "makes clear [] [Mr. Aragon] did not come peacefully or submit" to officers.[134]

Mr. Aragon argues this factor weighs in his favor because he was not fleeing or resisting arrest when Officers Collings and Danielson struck him in the head.[135]  Specifically, Mr. Aragon contends he "was not fleeing—nor could he with three officers restraining him in the bathtub."[136] To support his position, Mr. Aragon points to testimony from Officer Collings and Officer Danielson indicating they were not concerned about Mr. Aragon escaping the bathroom.[137]  But Mr. Aragon's argument is unavailing where Officers Collings and Danielson do not assert Mr. Aragon made any attempt to flee.[138]  Mr. Aragon made it very clear—he had no intention of leaving the residence.  Instead, the officers rely on Mr. Aragon's resistance.

While Mr. Aragon concedes he failed to follow officers' instructions and admits he did not hold still in the bathtub, he contends he did not actively resist arrest because "noncompliance

---

[134] (Reply 18, Doc. No. 121 (citing Ex. B to Second MSJ, Collings Video 8:10–11:00, Doc. No. 114-2.)  Although the bodycam footage is often blurry, difficult to follow, or obstructed by the police shield or bodies, it is clear (and is supported by other evidence in the record) that a struggle took place in the bathroom.  It is clear officers struggled with Mr. Aragon for almost a minute and a half before handcuffing and removing Mr. Aragon from the bathroom.  (Ex. B to Second MSJ, Collings Video 8:13–9:40, Doc. No. 114-2.)

[135] (Opp'n 24, Doc. No. 116.)

[136] (*Id.* at 25.)

[137] (*See* Ex. C to Second MSJ, Collings Dep. 77:23–25, Doc. No. 114-3 ("Q: Any concern that Mr. Aragon would escape from the bathroom before you decided to go in there?  A: No."); Ex. E to Second MSJ, Danielson Dep. 61:7–9, Doc. No 114-5 ("Q: [A]ny discussion about any concern that Mr. Aragon would escape?  A: Not that I recall.").)

[138] (Reply 18, Doc. No. 121.)

does not equate to resisting arrest."[139]  Mr. Aragon relies on *McWilliams v. DiNapoli*[140] and *Surat*[141] to support this contention, but Mr. Aragon's reliance on these cases is misplaced.  In *McWilliams*, the court held an officer's use of force was excessive when the officer voluntarily reengaged a plaintiff in a confrontational manner although the plaintiff was actively leaving the scene.[142]  After initiating the encounter, the officer made no attempt to diffuse the confrontation and proceeded to punch, tackle, and put plaintiff in a chokehold.[143]

Mr. Aragon's situation is distinguishable.  First, officers attempted to use numerous lesser means of force to remove Mr. Aragon from the residence.  Only after exhausting these less forceful means did officers physically confront Mr. Aragon, as a last resort.  While the use of lesser means is not required, it is relevant to the totality of the circumstances.[144]  Second, the plaintiff in *McWilliams* was actively complying with the officer's commands when the officer physically reengaged him.[145]  That is not what happened here.  Mr. Aragon's behavior— consistently failing to comply with officers' orders, damaging property, barricading himself in the home, grabbing and holding an officer's wrist, and engaging in a minute-and-a-half long struggle with officers in the bathroom—does not indicate any level of compliance.

---

[139] (Opp'n 25, Doc. No. 116.)

[140] 40 F.4th 1118 (10th Cir. 2022).

[141] 52 F.4th 1261.

[142] *McWilliams*, 40 F.4th at 1122.

[143] *Id.*

[144] *Cf. Armijo v. Peterson*, 601 F.3d 1065, 1075 (10th Cir. 2010) (stating "[t]he Fourth Amendment does not require officers to use the least restrictive means").

[145] *McWilliams*, 40 F.4th at 1122.

Lastly, Mr. Aragon contends grabbing Officer Danielson's wrist was "no more than minimal resistance," comparable to *Surat* and, therefore, did not warrant the amount of force employed.[146]  If Mr. Aragon had only briefly grabbed Officer Danielson's wrist and immediately released it, in the absence of all other indications of threat and resistance, this might be true.  But, as described above, the argument fails when considering the totality of the circumstances.

Viewing the totality of the circumstances, the undisputed facts show Mr. Aragon resisted arrest throughout the entire encounter with TCPD officers, including during the bathroom struggle where Mr. Aragon grabbed Officer Danielson's arm.  The amount of force employed by Officers Collings and Danielson—punching Mr. Aragon in the head or face only until he released his grip on Officer Danielson—was objectively reasonable to free Officer Danielson.[147]  This is especially true where the punching stopped as soon as Mr. Aragon released Officer Danielson's arm.[148]  For these reasons, the third *Graham* factor weighs against Mr. Aragon.

---

[146] (Opp'n 25, Doc. No. 116.)

[147] *See Hall*, 2022 U.S. Dist. LEXIS 156682, at *13–14.

[148] *Id.*  Mr. Aragon argues a reasonable jury could find "the punches continued after Mr. Aragon was subdued."  (Opp'n 26, Doc. No. 116.)  But he fails to cite any supportive evidence to contradict Officers Collings' and Danielson's testimony on this matter—which is insufficient to resist summary judgment.  (*Compare* Ex. C to Second MSJ, Collings Dep. 72, Doc. No. 114-3 (containing no testimony regarding the number of times Officer Collings punched Mr. Aragon); Ex. E to Second MSJ, Danielson Dep. 74, Doc. No 114-5 (containing no testimony regarding the number of times Officer Danielson punched Mr. Aragon); Ex. B to Second MSJ, Collings Video 8:17–9:34, Doc. No. 114-2 (inconclusive); Ex. D to Second MSJ, Danielson Dep. 5:42–7:00, Doc. No. 114-4 (inconclusive), *with* Ex. C to Second MSJ, Collings Dep. 71:6–20, Doc. No. 114-3 ("A: I struck Mr. Aragon in the face twice with my left hand. . . . Q: Do you recall hitting him in addition to that?  A: No, I did not."); Ex. E to Second MSJ, Danielson Dep. 64:15–19, Doc. No 114-5 ("So as [Mr. Aragon] has his grip on me, I strike him.  It was in the face, head area.  And I can't tell you how many times that happened.  But I can tell you as soon as he let go, that stopped.").)

       d.  *Mental Health*

Finally, "a detainee's mental health must be taken into account when considering the

officers' use of force"[149] because "[t]he problems posed by an unarmed, emotionally distraught

individual who is creating a disturbance are ordinarily different from those involved in law

enforcement efforts to subdue an armed and dangerous criminal."[150]   However, courts consider

this factor most often in the context of deadly force.[151]

Mr. Aragon argues his mental health should be considered, and this factor weighs in his

favor.  He contends Officers Collings and Danielson knew he was not in ordinary mental

health.[152]   Despite Officers Collings' and Danielson's arguments otherwise, evidence in the

record supports this contention.[153]   Nevertheless, it is not entirely clear to what extent this factor

---

[149] *Giannetti*, 216 F. App'x at 764; *see also Estate of Ceballos v. Husk*, 919 F.3d 1204, 1217
(10th Cir. 2019) (considering mental health as a factor).

[150] *Cardall*, 845 F. Supp. 2d at 1192 (alteration in original) (citing *Deorle v. Rutherford*, 272
F.3d 1272, 1283 (9th Cir. 2001)).

[151] *See generally Aldaba v. Pickens*, 777 F.3d 1148, 1151 (10th Cir. 2015); *Estate of Ceballos*,
919 F.3d 1204; *Cardall*, 845 F. Supp. 2d 1182; *Giannetti*, 216 F. App'x 756; *Finlinson v.
Millard Cnty.*, No. 2:16-cv-01009, 2018 U.S. Dist. LEXIS 185262, at *20 (D. Utah Oct. 29,
2018) (unpublished).

[152] (Opp'n 26, Doc. No. 116.)

[153] (Ex. A to Second MSJ, Arrest Report 5, Doc. No. 114-1 ("[Mr. Aragon]'s conversation inside
the residence was completely irrational, and incoherent making absolutely no sense.  [Mr.
Aragon] stated he was Jesus Christ, and had been alive for over 2000 years," and "[Mr. Aragon]
again started rambling incoherently, his speech was extremely fast and almost impossible to
understand.  While [he] spoke it seemed as if he was talking with two different people,
answering his own questions and arguing with himself."); *id.* at 8 "[Robert] Aragon cautioned
me that [Mr. Aragon] was very delusional.").)

impacts the overall reasonableness analysis—especially where most courts consider this factor in the context of deadly force, which is not at issue here.[154]

Mr. Aragon relies on *Cardall*, a case where officers knew they were responding to a nonviolent "psychiatric situation" reported by Mr. Cardall's wife out of concern for his personal safety.[155]  Officers knew Mr. Cardall was unarmed (because he was naked), Mr. Cardall attempted to comply with officers' commands, and there was no physical altercation between Mr. Cardall and the officers.[156]  Despite all of this, officers tased Mr. Cardall twice, resulting in his death.[157]  While evidence in the record indicates Officers Collings and Danielson knew Mr. Aragon was not thinking rationally, other circumstances existed which were not at play in *Cardall*.  For example, Officers Collings and Danielson were responding to a burglary in progress (a felony), they had reason to believe Mr. Aragon was likely armed with knives, and Mr. Aragon resisted officers at every turn—including physically resisting.  Even then, Officers Collings and Danielson did not use deadly force.  Rather, they chose to employ only the amount of force necessary to free Officer Danielson from Mr. Aragon's grasp and control his resistance.

While the impact of this factor is less clear in the context of this case, employing deadly force against an unarmed person with diminished mental capacity is different than employing the amount of force necessary to bring a resistant person with diminished mental capacity into compliance with officers' lawful commands and to manage the threat posed.  Officers Collings

---

[154] *Cf. Aldaba v. Pickens*, 777 F.3d 1148, 1151 (10th Cir. 2015); *Estate of Ceballos*, 919 F.3d 1204; *Cardall*, 845 F. Supp. 2d 1182; *Giannetti*, 216 F. App'x 756; *Finlinson*, 2018 U.S. Dist. LEXIS 185262, at *20.

[155] *Cardall*, 845 F. Supp. 2d at 1187–88.

[156] *Id.* at 1188–89.

[157] *Id.* at 1189.

and Danielson did the latter, which was objectively reasonable under the circumstances, even considering Mr. Aragon's mental state.  Where Mr. Aragon was experiencing diminished mental capacity, but Officers Collings and Danielson acted objectively reasonably, this factor is neutral.

Because the undisputed material facts show all three *Graham* factors weigh against Mr. Aragon and the mental-health factor is neutral, Mr. Aragon has failed to demonstrate Officers Collings and Danielson used excessive force against him in violation of his Fourth Amendment rights.  Accordingly, he has failed to rebut Officers Collings' and Danielson's claim of qualified immunity.  Further, because Mr. Aragon has failed to satisfy the first prong of the qualified-immunity test, the analysis could end here.[158]  Nevertheless, a brief evaluation of the second prong of the qualified-immunity test follows.

## II.    Clearly Established Right

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."[159]  Even if Mr. Aragon could demonstrate Officers Collings and Danielson violated his rights under the Fourth Amendment, he would not survive summary judgment because he has not demonstrated that punching an actively resisting subject was a violation of a clearly established right in 2014.

For a right to be clearly established, "the state of the law at the time of an incident [must have] provided fair warning to the defendants that their alleged [conduct] was unconstitutional."[160]  In other words, "existing law must have placed the constitutionality of the

---

[158] *See Olsen*, 312 F.3d at 1312.

[159] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

[160] *Id.* (second alteration in original) (internal quotation marks omitted).

officer's conduct beyond debate."[161]  "A plaintiff may satisfy this standard by identifying an

on-point Supreme Court or published Tenth Circuit decision" or by demonstrating "the clearly

established weight of authority from other courts [] have found the law to be as the plaintiff

maintains."[162]  Although a plaintiff "is not required to show [] that the very act in question [was]

previously [] held unlawful,"[163] courts must be careful not to define "clearly established law" "at

a high level of generality."[164]  Instead, courts must ensure this analysis is "particularized to the

facts of the case."[165]  Courts have recognized specificity as "especially important in the Fourth

Amendment context, where . . . [i]t is sometimes difficult for an officer to determine how the

relevant legal doctrine, here excessive force, will apply to the factual situation the officer

confronts."[166]

     Mr. Aragon relies on *McWilliams*, *Osterhout v. Morgan*,[167] *Olsen v. Layton Hills Mall*,[168]

*Vette v. K-9 Unit Deputy Sanders*,[169] and the pre-2014 authority cited therein, for the proposition

that punching or striking an unarmed misdemeanant subject who does not pose an immediate

---

[161] *Surat*, 52 F.4th at 1276 (internal quotation marks omitted).

[162] *Id.*

[163] *Walton v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

[164] *White v. Pauly*, 580 U.S. 73, 79 (2017).

[165] *Id.*

[166] *Mullenix*, 577 U.S. at 12 (second alteration in original).

[167] 763 F. App'x 757, 763 (10th Cir. 2019) (unpublished).

[168] 312 F.3d 1304, 1309–10, 1315 (10th Cir. 2002)

[169] 989 F.3d 1154, 1172–73 (10th Cir. 2021).

threat to officers is a clearly established Fourth Amendment violation.[170]  Officers Collings and

Danielson disagree with Mr. Aragon's reliance on these cases, arguing they are distinguishable

because they involve plaintiffs who were already subdued, fully apprehended, or were complying

with officers' commands when officers employed force against them.[171]

     For the reasons noted by Officers Collings and Danielson, the cases Mr. Aragon relies on

are distinguishable.  First, as described above, Mr. Aragon was not a misdemeanant.  Officers

Collings and Danielson responded to a call of a burglary in progress on the night in question—a

felony.  Second, the "clearly established" analysis in the cases cited by Mr. Aragon hinges on

whether the subjects were resisting arrest or already subdued when force was used against

them.[172]  The undisputed evidence in this case shows Mr. Aragon was not already subdued;

officers reasonably believed he was resisting arrest.  The legal authority cited by Mr. Aragon

does not support the existence of a clearly established right consistent with the facts of this

case—where Mr. Aragon was actively resisting arrest and grabbing an officer, and Officers

Collings and Danielson punched him in the head or face only until he released his grip.  Indeed,

Mr. Aragon has presented no authority to establish punching or striking a felony subject who

officers reasonably believe is likely armed and who is actively resisting arrest is a violation of a

---

[170] (Opp'n 28, Doc. No. 116.)

[171] (Reply 20, Doc. No. 121.)

[172] *See generally McWilliams*, 40 F.4th 1118 (subject was actively complying and was not fleeing or resisting arrest); *Vette*, 989 F.3d 1154 (subject initially fled but was fully apprehended by the point the officer used force against him); *Osterhout*, 763 F. App'x 757 (subject was "not suspected of a serious crime" and "put up little to no resistance" where he immediately stopped and put his hands up once he realized he was interacting with officers); *Olsen*, 312 F.3d 1304 (subject was complying with the officer's orders); *see also Perea*, 817 F.3d at 1205 (stating "continued use of force *after an individual has been subdued* is a violation of the Fourth Amendment" (emphasis added)).

clearly established right.  Accordingly, even if Mr. Aragon had satisfied prong one, he would still fail on prong two of the qualified-immunity analysis.

CONCLUSION

Because the undisputed facts show all three *Graham* factors—severity of the crime, whether the subject posed an immediate threat to officers' safety, and whether the subject was actively resisting or evading arrest—weigh against Mr. Aragon, and where the mental-health factor is neutral, Mr. Aragon has failed to establish Officers Collings and Danielson violated his clearly established constitutional rights.  Accordingly, Officers Collings and Danielson are shielded by qualified immunity and are entitled to summary judgment.

RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS the district judge grant Officers Collings and Danielson's second motion for summary judgment.[173]  The court will send copies of this Report and Recommendation to all parties, who are notified of their right to object to it.[174]  Any objection must be filed within fourteen days of service.  Failure to object may constitute waiver of objections upon subsequent review.

DATED this 28th day of June, 2023.

BY THE COURT:

*Daphne A. Oberg*
Daphne A. Oberg
United States Magistrate Judge

---

[173] (Doc. No. 114.)

[174] *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72(b).