## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JESUS ELDON ARAGON,<br><br>                    Plaintiff,<br><br>v.<br><br>LONNIE COLLINGS, an individual; BRIAN DANIELSON, an individual; and DOES 1–10,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>• **OVERRULING [129] PLAINTIFF'S OBJECTION TO REPORT AND RECOMMENDATION**<br>• **ADOPTING [128] REPORT AND RECOMMENDATION**<br>• **GRANTING [114] DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00620-DBB-DAO<br><br>District Judge David Barlow |

Before the court is Plaintiff Jesus Eldon Aragon's ("Mr. Aragon"[1]) Objection to Report and Recommendation.[2] Mr. Aragon objects to the magistrate judge's recommendation[3] to grant Defendants Lonnie Collings ("Officer Collings") and Brian Danielson's ("Officer Danielson") (collectively "Defendants") Second Motion for Summary Judgment.[4] Having reviewed the briefing and law, the court finds that oral argument would not materially assist the court in reaching a decision.[5] For the reasons below, the court overrules Mr. Aragon's objection, adopts the Report and Recommendation, and grants summary judgment in favor of Defendants.

---

[1] Mr. Aragon is sometimes referred to as "Jesse" in Defendants' depositions. *See, e.g.*, Dep. of Brian Danielson ("Danielson Dep.") 29:9–22, ECF No. 114-5, filed Dec. 20, 2022.
[2] Pl. Obj. to R. & R. ("Obj. to R. & R."), ECF No. 129, filed July 12, 2023.
[3] R. & R. to Grant Defs. Second Mot. for Summ. J. ("R. & R."), ECF No. 128, filed June 28, 2023.
[4] Second Mot. for Summ. J. ("Second MSJ"), ECF No. 114, filed Dec. 20, 2022.
[5] *See* DUCivR 7-1(g).

## BACKGROUND

Mr. Aragon's mother (the "homeowner") owned a home (the "Residence") in Tooele, Utah.[6] On April 30, 2014, Mr. Aragon's brother Robert Daniel Aragon ("Robert"[7]) informed Tooele City Police Department that Mr. Aragon had broken into the Residence.[8] Dispatch relayed to officers a burglary in progress.[9] The homeowner informed officers that Mr. Aragon had been evicted from the Residence two weeks earlier and that officers had arrested him for trespassing the previous night.[10] She did not want Mr. Aragon in her house and demanded officers remove him.[11] Additionally, she told Officer Collings that she was afraid of Mr. Aragon because he had threatened to hurt her.[12] She notified officers she had a protective order against Mr. Aragon.[13] And she gave officers a house key.[14]

Robert warned officers "to be careful" because there were knives "stashed around the house" and Mr. Aragon was likely carrying a "big knife."[15] Robert informed Officer Collings Mr. Aragon was "acting crazy, . . . destroying the house, . . . was violent"; and Robert was "very

---

[6] Incident Report 6, ECF No. 114-1, filed Dec. 20, 2022.

[7] To avoid confusion, the court refers to the plaintiff as "Mr. Aragon" and the plaintiff's brother as "Robert."

[8] Incident Report 6, 9; Danielson Dep. 41:13–20.

[9] Dep. of Lonnie Collings ("Collings Dep.") 35:19–24, ECF No. 114-3, filed Dec. 20, 2022.

[10] Incident Report 9; Danielson Dep. 41:14–15; Collings Dep. 44:11–14.

[11] Incident Report 8; Collings Dep. 41:1–7 ("[She] was insistent that we remove him from the home."); 45:1–2 ("demanding that we remove [him] from the home"). Mr. Aragon contends these conversations are hearsay. Pl. Resp. in Opp'n to Def. Second Mot. Summ. J. ("Opp'n") 5, ECF No. 116, filed Jan. 30, 2023. But the statements are not hearsay because they are being offered to show the effect on the listener. *See, e.g.*, *United States v. Murry*, 31 F.4th 1274, 1292 (10th Cir. 2022), *cert. denied sub nom. Ramcharan v. United States*, 143 S. Ct. 245 (2022).

[12] Collings Dep. 43:25–44:6.

[13] *Id.*; Incident Report 8–9.

[14] Incident Report 6, 8–9.

[15] Danielson Dep. 42:7–11.

2

concerned about [officers] going into the home."[16] Even so, the homeowner and Robert insisted officers remove Mr. Aragon from the Residence.[17]

Officers commanded Mr. Aragon to leave the home.[18] Officers also deployed a robot into the house to reconnoiter.[19] Through the robot, Robert tried to convince Mr. Aragon to leave.[20] Officer Danielson described Mr. Aragon's responses as "super[-]fast gibberish kind of talking that [he] . . . couldn't make sense of . . . ."[21] Later, officers heard loud banging noises from the home.[22] After the unsuccessful attempts to persuade Mr. Aragon to exit, officers discussed removing him in "the most tactful" way.[23] Ultimately, they decided to enter the Residence.[24]

Defendants knew Mr. Aragon was in a bathroom[25] but they did not know if he had a weapon or his intentions.[26] Officers elected to shoot about twenty-five pepper balls at the bathroom ceiling.[27] They hoped the pepper would cause Mr. Aragon to exit.[28] About thirty

---

[16] Collings Dep. 39:12–20, 42:6–16; *see* Danielson Dep. 47:5–8.
[17] Collings Dep. 40:5, 41:4–5, 45:1–2, 46:20–47:12, 99:4–1; Danielson Dep. 41:19–20. Mr. Aragon contends these conversations are hearsay. Opp'n 5. The statements are not hearsay because they are offered to show effect on the listener.
[18] Collings Dep. 48:8–9.
[19] Danielson Dep. 47:17–19.
[20] Collings Dep. 40:12–23; Danielson Dep. 47:20–48:8.
[21] Danielson Dep. 48:4–8; *see* Incident Report 6 ("Jesse's conversation inside the residence was completely irrational, and incoherent making absolutely no sense. Jesse stated he was Jesus Christ, and had been alive for over 2000 years. . . . Jesse again started rambling incoherently, his speech was extremely fast and almost impossible to understand. While Jesse spoke it seemed as if he was talking with two different people, answering his own questions and arguing with himself.").
[22] Collings Dep. 41:5–7, 98:11–24; Collings Bodycamera Footage ("Collings Video") 0:00–0:25, ECF No. 114-2, filed Dec. 20, 2022 (on file with the Clerk of Court). Officers observed that a sink had been forcibly removed from the bathroom wall. Collings Dep. 60:12–14.
[23] Collings Video 0:38–00:42; Collings Dep. 99:4–11 ("I said we're trying to do this the easiest way without hurting anybody, the most tactful way without damaging anything.").
[24] Collings Dep. 47:10–18.
[25] *Id.* at 46:22–47:3; Danielson Dep. 50:15–17.
[26] Collings Dep. 48:3–4; Danielson Dep. 46:19–47:8.
[27] Collings Video 4:35–4:45; Collings Dep. 47:22–24. The active ingredient in pepper balls is oleoresin capsicum. Its use is intended to induce coughing, mucus production, and eye irritation. Collings Dep. 50:11–14.
[28] Collings Dep. 48:17–18.

seconds later, Officer Collings asked, "you want some more, or are you going to come out? Jesse, come out."[29] Mr. Aragon remained in the bathroom.[30]

About three minutes later, officers decided to breach the bathroom and arrest Mr. Aragon.[31] Officers still did not know if he had a knife or other weapon.[32] Officer Collings entered the bathroom first with a police shield.[33] Mr. Aragon was in the bathtub.[34] Officer Collings put the shield over Mr. Aragon to keep him from "swinging or swinging anything[.]"[35] At the bottom of the bathtub, Officer Collings saw a hammer or mallet and a drill bit that looked like a shiv.[36] Water was spraying and Officer Danielson's flashlight provided the only light.[37]

Officers struggled to take Mr. Aragon into custody for over ninety seconds.[38] Officer Collings commanded Mr. Aragon to show his hands[39] and another officer shouted, "stop resisting."[40] Officer Danielson testified that Mr. Aragon was "kicking, thrashing, [and] rolling."[41] Officer Collings testified that Mr. Aragon pushed on the shield, pulled his hands into his body, and rolled toward the hammer and drill bit, making the officer "very, very nervous."[42] He tried to get control of Mr. Aragon's hands to apply handcuffs.[43] About the same time, Mr. Aragon

---

[29] Collings Video 5:18–5:27.
[30] *See id.* at 5:27–8:13.
[31] Collings Dep. 56:4–5.
[32] *Id.* at 48:3–18, 57:8–10 (Q. And you said . . . you were concerned about being stabbed? A. Yes."), 57:21–58:8; Collings Video 6:17–6:21 ("He didn't have any weapons, right? We don't know").
[33] Collings Dep. 56:8–10, 60:6–7; Collings Video 8:06–8:17.
[34] Danielson Dep. 61:10–18; Collings Dep. 60:3.
[35] Collings Video 8:15–25; Collings Dep. 60:6–7.
[36] Collings Dep. 60:8–12, 76:19–21; Ex. F, ECF No. 121-1, filed Feb. 17, 2023 (photograph of bathtub); Danielson Dep. 32:4–8 ("It was a drill bit with a wrapped handle or some kind of cloth.").
[37] Collings Dep. 60:3, 13; Danielson Bodycamera Footage ("Danielson Video") 5:42–7:00, ECF No. 114-5, filed Dec. 20, 2022 (on file with the Clerk of Court).
[38] *See* Danielson Video 5:38–7:00; Collings Video 8:13–9:40.
[39] Collings Video 8:18–8:23.
[40] Collings Dep. 69:23–24; Collings Video 8:55–9:01.
[41] Danielson Dep. 63:22–24.
[42] Collings Dep. 63:7–64:2, 66:17–19, 69:8–9; Danielson Dep. 64:1–3.
[43] Collings Dep. 69:15–18.

grabbed Officer Danielson's wrist and tried to pull him toward the bathtub.[44] Officer Danielson

yelled, "stop resisting,"; "he's got my arm"; and "let go of me."[45] The officer testified he had

"major concern" about getting pulled toward the bathtub as his AR-15 rifle dangled from a

single-point sling.[46] Officer Danielson struck Mr. Aragon in the face and head an unknown

number of times.[47] Officer Collings also struck Mr. Aragon in the face twice with his left fist as

Mr. Aragon kicked and tried to pull his arm away.[48] Mr. Aragon started screaming.[49] Defendants

stopped hitting Mr. Aragon after he released his grip on Officer Danielson's wrist.[50]

 After the shield was removed,[51] officers applied handcuffs and moved Mr. Aragon to the

home's front room.[52] Defendants testified Mr. Aragon again started kicking.[53] Officer Collings

pushed him on his stomach while other officers grabbed his legs and applied shackles.[54]

Paramedics saw to Mr. Aragon and officers transported him to jail.[55]

 Mr. Aragon filed a complaint under 42 U.S.C. § 1983 on August 3, 2018.[56] He filed the

Amended Complaint on April 21, 2021.[57] Defendants moved for summary judgment on

---

[44] Danielson Dep. 64:4–11, 70:9–20; Danielson Video 6:25–6:26.
[45] Danielson Video 6:17–6:30.
[46] Danielson Dep. 64:8–15 ("I'm scared that Jesse, at this point, is going to get me into the tub and get ahold of a firearm."), 74:2–17.
[47] *Id.* at 64:16–18.
[48] Collings Dep. 71:2–24, 74:7–9, 76:5–8.
[49] Collings Video 9:05–9:28.
[50] Collings Dep. 71:6–20, 74:20–24, 110:15–16; Danielson Dep. 64:15–19, 78:23–79:3.
[51] Collings Video 9:25–9:30.
[52] *Id.* at 9:00–10:30; Collings Dep. 70:1–6, 81:9–82:1, 83:6–1; Danielson Dep. 64:4–20, 79:15–21.
[53] Collings Dep. 83:15–17; Danielson Dep. 81:6–8.
[54] Collings Dep. 83:17–21, 88:14–16; Danielson Dep. 81:6–9; Collings Video 10:30–10:55.
[55] Collings Dep. 95:15–96:2; Danielson Dep. 84:10–13, 86:19–21.
[56] ECF No. 6.
[57] ECF No. 80. The Amended Complaint alleges several instances of excessive force. *See* Am. Compl. ¶¶ 24–32. But Mr. Aragon's Opposition centers on the incident in the bathroom where Defendants punched him in the face and head. *See* Opp'n 17 ("A reasonable jury could find that Officers Collings and Danielson used excessive force when they repeatedly punched Mr. Aragon in the head and face while he lay on his back in the bathtub, trapped beneath the shield."). In addition, the magistrate judge noted that Mr. Aragon clarified at a June 5 hearing that his "excessive

November 16, 2021.[58] Mr. Aragon requested that the court deny the motion under Federal Rule of Civil Procedure 56(d).[59] The court did so on May 26, 2022.[60] Defendants then filed their Second Motion for Summary Judgment on December 20, 2022.[61] Mr. Aragon responded on January 30, 2023.[62] Defendants filed a reply eighteen days later.[63] The magistrate judge issued her Report and Recommendation on June 28, 2023.[64] Two weeks later, Mr. Aragon objected to the report.[65] Defendants responded on July 21, 2023.[66]

## STANDARD

A plaintiff's timely and proper objection[67] to a magistrate judge's report and recommendation triggers de novo review on the issues specified in the objection.[68] The objections must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute."[69] The court reviews unobjected-to portions for clear error.[70]

---

force claim focuses on this specific incident, although he relies on the other incidents to the extent they inform the totality-of-the-circumstances evaluation." R. & R. 3 n.10.

[58] ECF No. 87.

[59] ECF No. 92.

[60] ECF No. 102.

[61] *See* Second MSJ.

[62] *See* Opp'n.

[63] *See* Reply.

[64] *See* R. & R.

[65] *See* Obj. to R. & R.

[66] ECF No. 130; *see* DUCivR 72-3(b).

[67] Fed. R. Civ. P. 72(a) (fourteen days to object).

[68] Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

[69] *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996); *see Lockert v. Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988) ("[A]n objection stating only 'I object' preserves no issue for review.").

[70] *See Johnson v. Progressive Leasing*, No. 2:22-cv-00052, 2023 WL 4044514, at *2 (D. Utah June 16, 2023) (citing *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999)); *see* Fed. R. Civ. P. 72(b) adv. comm. note to 1983 amend. ("[T]he court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").

To prevail on summary judgment, the movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[71] The court "view[s] the evidence and any reasonable inferences from that evidence in the light most favorable to the non-moving party."[72] "[A] plaintiff can survive summary judgment by establishing genuine issues of material fact that a jury must decide."[73] "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."[74] But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ."[75]

## DISCUSSION

At issue is whether qualified immunity shields Defendants from Mr. Aragon's § 1983 claim. The magistrate judge found that Mr. Aragon failed to show Defendants used excessive force.[76] Mr. Aragon contends the magistrate judge erred on both prongs of the qualified immunity analysis: (a) whether Defendants' use of force was objectively reasonable and (b) whether Defendants violated a clearly established constitutional right. The court reviews the two prongs de novo.

Under 42 U.S.C. § 1983, "a person acting under color of state law who 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

---

[71] Fed. R. Civ. P. 56(a).
[72] *Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir. 2023).
[73] *Helvie v. Jenkins*, 66 F.4th 1227, 1232 (10th Cir. 2023).
[74] *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023).
[75] *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 790 (10th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see Helvie*, 66 F.4th at 1235 ("'[T]he general rule is that,' at the summary judgment stage of litigation, the party challenging the credibility of a sworn statement 'must' produce 'specific facts . . . in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice.'" (quoting Wright & Miller, 10A *Fed. Practice & Proc.* § 2726)).
[76] R. & R. 14.

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.'"[77] Qualified immunity guards government officials against liability "insofar as their conduct does not violate clearly established . . . constitutional rights."[78] It "protects all but the plainly incompetent or those who knowingly violate the law."[79] "When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation."[80] Failure to satisfy either prong will result in judgment for the defendant.[81] The court addresses each prong in order.

I.   **Mr. Aragon Fails to Show a Genuine Dispute of Material Fact as to His Claim Defendants Violated His Constitutional Right to be Free From Excessive Force.**

Mr. Aragon alleges Defendants violated his Fourth Amendment right to be free from excessive and unjustified force.[82] "[A]pprehension by the use of . . . force is a seizure subject to the reasonableness requirement of the Fourth Amendment."[83] The proper inquiry is whether "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[84] "Reasonableness is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[85] When determining whether a seizure was reasonable, the court must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances

---

[77] *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1272 (10th Cir. 2022) (quoting 42 U.S.C. § 1983).
[78] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).
[79] *Wise*, 72 F.4th at 1205.
[80] *Valdez v. Macdonald*, 66 F.4th 796, 831 (10th Cir. 2023) (citation omitted).
[81] *Id.*
[82] Am. Compl. ¶ 51, ECF No. 80, filed Apr. 21, 2021.
[83] *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023) (citation omitted).
[84] *Reavis v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).
[85] *Palacios*, 61 F.4th at 1256 (quoting *Graham*, 490 U.S. at 396).

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[86] "The ultimate question 'is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'"[87]

"Whether an officer has used excessive force depends on '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'"[88] Courts may also consider a suspect's mental health.[89] The court addresses each factor in order.

### A.    The Severity-of-the-Crime Factor Weighs Against Mr. Aragon.

The court first analyzes the relevant crime's severity. As the offense's severity increases, the more likely an officer's use of force will be reasonable. "[A] minor offense supports only the use of minimal force."[90] "A misdemeanor committed in a 'particularly harmless manner . . . reduces the level of force that [is] reasonable for [the officer] to use.'"[91] Mr. Aragon contends officers arrived at the Residence to investigate trespassing—a misdemeanor.[92] Defendants contend that they responded to a burglary in progress—a felony—and assert that their on-scene observations corroborated the dispatch call.[93]

---

[86] *Graham*, 490 U.S. at 396.
[87] *Surat v. Klamser*, 52 F.4th 1261, 1271 (10th Cir. 2022) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007)).
[88] *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Graham*, 490 U.S. at 396).
[89] *See Giannetti v. City of Stillwater*, 216 F. App'x 756, 764 (10th Cir. 2007) (not selected for publication) ("[A] [suspect]'s mental health must be taken into account when considering the officers' use of force and it is therefore part of the factual circumstances the court considers under *Graham*." (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004))); *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1190–91 (D. Utah 2012); *see also Brooks v. Clark County*, 828 F.3d 910, 920 (9th Cir. 2016); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005).
[90] *Wilkins*, 33 F.4th at 1273.
[91] *Id.* (quoting *Casey*, 509 F.3d at 1281).
[92] Obj. to R. & R. 3; Utah Code Ann. § 76-6-206(3) (West 2023).
[93] Reply 15–16.

Record evidence does not support Mr. Aragon's assertion that officers went to arrest Mr. Aragon for mere criminal trespass. In his signed affidavit of probable cause, Officer Danielson describes that officers went to the Residence "in reference to a burglary in progress."[94] The dispatch log characterized the incident as a burglary in progress.[95] Officer Collings testified that officers arrived at the Residence because "there were people burglarizing a home."[96] Defendants recorded the same facts in the incident report.[97] Burglary is a felony under Utah law.[98] "[B]inding precedent [thus] indicates the first *Graham* factor weighs against the plaintiff."[99]

Mr. Aragon further contends officers sought to arrest Mr. Aragon only to remove him from the Residence.[100] His contention is not supported by the facts. Defendants had reason to arrest Mr. Aragon beyond the homeowner's or Robert's insistence that officers remove him. The homeowner said she had a protective order against Mr. Aragon "because he was violent."[101] She was afraid of him because he "had threatened to hurt her" and she "could not have him in her home."[102] She reported Mr. Aragon had trespassed at the Residence the previous night.[103] As for Robert, he told Defendants Mr. Aragon "was in the home, he was acting crazy, . . . he was destroying the house, . . . he was violent," and he likely had a knife on his person and had other knives "stashed around the house."[104] Robert warned officers to be careful.[105] Officers heard

---

[94] Aff. of Probable Cause 2, ECF No. 116-1, filed Jan. 30, 2023.
[95] Call Log, ECF No. 121-2, filed Feb. 17, 2023.
[96] Collings Dep. 35:19–24.
[97] Incident Report 6, 9.
[98] Utah Code Ann. § 76-6-202(3) (West 2023).
[99] *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[Defendant] was wanted for a felony at the time of the challenged use of force.").
[100] Obj. to R. & R. 4.
[101] Collings Dep. 43:25–44:2; *see* Request for Protective Order, ECF No. 121-2.
[102] Collings Dep. 44:2–12.
[103] *Id.* at 44:12–13.
[104] *Id.* at 39:12–20; 107:17–24; Danielson Dep. 42:7–11.
[105] Danielson Dep. 42:7–8.

loud banging from the Residence.[106] Officer Collings suspected at the time that Mr. Aragon was

damaging the home.[107] And Mr. Aragon refused to exit despite attempts to coax him; he instead

hid in the bathroom.[108] He refused to leave even after officers deployed a pepper agent.[109]

Defendants did not arrest Mr. Aragon on suspicion of a minor crime. Defendants arrived

at the Residence suspecting Mr. Aragon had committed a *serious* crime. They also had reason to

believe Mr. Aragon was physically dangerous and posed a threat of violence to the homeowner.

Viewing the record evidence in the light most favorable to Mr. Aragon, the severity-of-crime

factor weighs in favor of the officers.

### B.   The Immediacy-of-Threat Factor Weighs in Favor of Defendants' Use of Force as Objectively Reasonable.

For the second factor, the court must determine if Mr. Aragon posed "an immediate threat

to the safety of the officers or others[.]"[110] This factor "is undoubtedly the most important and

fact intensive factor in determining the objective reasonableness of an officer's use of force."[111]

The court "must look at whether the officers or others were in danger at the precise moment that

they used force."[112] Officers "may use increased force when a suspect is armed, repeatedly

ignores police commands, or makes hostile motions towards the officer or others."[113]

The magistrate judge found Defendants' belief that Mr. Aragon presented an immediate

safety threat as objectively reasonable.[114] Mr. Aragon raises several objections. First, Mr. Aragon

---

[106] Collings Dep. 41:5–7, 98:11–24; Collings Video 0:00–0:25; Danielson Dep. 60:18–24.
[107] Collings Dep. 41:5–7; 98:10–19.
[108] *Id.* at 46:18–47:3; 47:5–9; Danielson Dep. 50:15–17.
[109] *See* Collings Video 5:27–8:13.
[110] *Graham*, 490 U.S. at 396.
[111] *Wilkins*, 33 F.4th at 1273 (quoting *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017)).
[112] *Surat*, 52 F.4th at 1275 (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020)).
[113] *Wilkins*, 33 F.4th at 1273.
[114] R. & R. 23.

asserts the record does not show that Defendants reasonably believed he had a weapon or that Officer Collings believed Mr. Aragon could use a weapon. On the contrary, Mr. Aragon claims he was unarmed and trapped in the bathtub. He contends officers never expressed concerns about weapons and no officer verbally warned others of a weapon before or during the arrest.[115] In addition, he disputes Officer Collings's testimony about weapons in the bathtub.[116]

The record evidence paints a different picture. Before entering the house, Robert told officers that Mr. Aragon likely had a knife on his person and had stashed knives around the house.[117] Officers did not want to enter the house; they wanted Mr. Aragon to leave.[118] Officer Collings testified he was worried about Mr. Aragon having a weapon and possibly stabbing someone.[119] Pepper deployment failed to get Mr. Aragon to leave. Wielding a police shield, Officer Collings entered the bathroom first "in case [Mr. Aragon] did come at [him] with a weapon."[120] When one officer queried if Mr. Aragon had a weapon, another officer responded, "We don't know."[121] Officer Collings testified officers proceeded on the assumption Mr. Aragon had a weapon.[122] What is more, Officer Collings testified that when inside the bathroom and engaging with Mr. Aragon, he saw in the bathtub what looked like a hammer and a drill bit fashioned into a shiv.[123] The bathroom itself showed signs of significant damage.[124] Officer Collings further testified that Mr. Aragon at one point pulled his hands close to his body and

---

[115] Obj. to R. & R. 5.
[116] *Id.*
[117] Collings Dep. 39:12–20, 42:5–22, 48:8 – 9; 107:17–24; Danielson Dep. 42:7–11.
[118] Collings Dep. 41:1–4, 45:3–10.
[119] *Id.* at 48:3–8, 56:6–7; Danielson Dep. 46:19–23 ("I was concerned that he had weapons, yes.").
[120] Collings Dep. 56:6–10.
[121] Collings Video 6:15–6:21; Danielson Dep. 60:10–13 (testifying that he was not sure if Mr. Aragon possessed a weapon).
[122] Collings Dep. 59:9–16.
[123] *Id.* at 60:8–10, 68:7–69:2.
[124] *Id.* at 60:12–13 ("He had ripped the bathroom sink off the wall, and there was water spraying everywhere.").

rolled toward the hammer and drill bit, making Officer Collings "very, very nervous."[125] Because of the shield, officers could not see if Mr. Aragon had anything in his hands.[126] Even if Officer Collings did not see Mr. Aragon employ weapons, Officer Collings testified he was afraid he would reach them.[127] Officer Danielson also testified he feared Mr. Aragon might have a weapon.[128] For these reasons, Mr. Aragon fails to raise a genuine dispute as to whether officers thought he had a weapon during the arrest.

Mr. Aragon also contends Officer Danielson's unsecured rifle creates a genuine dispute of material fact. He asserts officers reacted unreasonably in punching him after he grabbed Officer Danielson. In particular, Mr. Aragon argues officers could not consider his potential access to the rifle a threat because Officer Danielson acted recklessly by failing to secure it.[129]

Considering the totality of the evidence, there is no material dispute that Officer Danielson considered Mr. Aragon an immediate threat. Before entering the bathroom, Officer Danielson had concern Mr. Aragon might be armed, perceived he was a dangerous person, and was generally scared.[130] Officer Danielson testified he saw Mr. Aragon "kicking, thrashing, rolling [and] . . . doing all sorts of stuff in th[e] tub."[131] He recalled that Mr. Aragon ignored repeated commands to show his hands and instead "ke[pt] sucking his hands into his body and holding them there so [officers] c[ouldn't] effectively arrest him."[132] Officer Danielson tried to

---

[125] *Id.* at 60:13–17, 66:17–19, 69:7–14.
[126] *Id.* at 66:15–17; Collings Video 8:15–9:00.
[127] Collings Dep. 69:12–14.
[128] Danielson Dep. 63:13–18 ("And when I see that, that—that scares me a little bit because I don't know why he's being pinned at that point. Does he have a weapon? Does he not have a weapon? Did he do something I didn't see because I was at the back of the line? I don't know. And so that's scary just seeing that.").
[129] Obj. to R. & R. 6; *see* Danielson Dep. 95:5–9; Danielson Video 5:53–6:27.
[130] Danielson Dep. 59:3–5, 60:6–9.
[131] *Id.* at 63:23–25.
[132] *Id.* at 64:1–3.

gain control of Mr. Aragon's hand but failed; Mr. Aragon grabbed his wrist tightly and "started to pull [him] towards the tub."[133] The officer testified that getting pulled toward Mr. Aragon was "a major concern and a huge safety concern" "[n]ot only as just a regular officer" but also due to the unsecured rifle.[134]

To be sure, reasonableness of officers' use of force can depend on "whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"[135] But Officer Danielson testified that he struck Mr. Aragon because he was afraid Mr. Aragon was pulling him into the tub and *might* access the rifle—not that he thought Mr. Aragon *was* actually reaching for the AR-15.[136] And once Mr. Aragon released his grip, Officer Danielson stopped striking him.[137] The unsecured rifle is thus not dispositive.

Last, Mr. Aragon cites *Surat v. Klamser*[138] for the proposition that officers acted unreasonably because he was at a "great physical disadvantage" while confined in the bathtub.[139] In *Surat*, an officer held a 115-pound suspect by the wrist to effect an arrest.[140] The suspect "attempted to pry [the officer's] fingers off of her arm and pawed at [his] arms."[141] In response, the 6-foot-200-pound officer used a takedown maneuver to throw the suspect to the ground.[142]

---

[133] *Id.* at 64:4–10.
[134] *Id.* at 64:9–13.
[135] *Pauly*, 874 F.3d at 1219 (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)); *see Rosales v. Bradshaw*, 72 F.4th 1145, 1152 (10th Cir. 2023) ("[W]e consider the extent to which an officer's reckless conduct prior to the use of force during the seizure *provoked* the suspect's actions." (emphasis added)).
[136] Danielson Dep. 64:13–18, 75:10–17 ("Q: Do you have any reason to believe that Mr. Aragon was actually reaching for your rifle? A. I never said he was reaching for my rifle. My worry was he was going to pull me into the tub, *which would give him access to that rifle*." (emphasis added)).
[137] *Id.* at 64:18–20.
[138] 52 F.4th 1261.
[139] Obj. to R. & R. 5.
[140] *Surat*, 52 F.4th at 1267.
[141] *Id.*
[142] *Id.*

The Tenth Circuit found the officer's use of force disproportionate and unreasonable.[143] Here, Defendants' actions were justified under a totality of the circumstances. Officers feared Mr. Aragon possessed a knife or other weapon.[144] Mr. Aragon kicked and struggled for over a minute.[145] He disobeyed commands to show his hands and instead moved towards weapons.[146] And he grabbed an officer's wrist and started to pull the officer toward the bathtub.[147] None of these facts were present in *Surat*.[148]

Viewing the evidence in the light most favorable to Mr. Aragon, no genuine dispute exists as to whether it was objectively reasonable for Defendants to believe Mr. Aragon posed an immediate threat. The undisputed facts show Defendants acted reasonably when they struck Mr. Aragon after he ignored police commands and grabbed Officer Danielson.

### C.   There Is No Genuine Dispute of Material Fact That Mr. Aragon Actively Resisted Arrest.

Under the third *Graham* factor, the court examines whether a suspect attempted to flee or actively resist arrest. "[W]here a plaintiff . . . was 'actively resisting arrest . . . there is no doubt th[at] officers [are] justified in employing some force against' the plaintiff."[149] The court considers "any resistance during the suspect's encounter with officers."[150] But "a suspect's initial resistance does not justify the continuation of force once the resistance ceases."[151]

---

[143] *Id.* at 1275.
[144] Collings Dep. 39:12–20, 42:6–16; *see* Danielson Dep. 42:7–11, 47:5–8.
[145] Collings Video 8:13–9:40.
[146] *Id.* at 8:18–8:23; Collings Dep. 63:7–64:2, 66:17–19, 69:8–9; Danielson Dep. 64:1–3.
[147] Danielson Dep. 64:4–10, 70:9–20; Danielson Video 6:25–6:26.
[148] *See Surat*, 52 F.4th at 1267, 1275.
[149] *Id.* at 1275.
[150] *Wilkins*, 33 F.4th at 1273.
[151] *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018).

The magistrate judge found that this factor favored Defendants because while Mr. Aragon may not have tried to flee, he resisted arrest.[152] Mr. Aragon contends he never attempted to flee and was never "violent towards the police."[153] He argues he did not intend to harm officers during the struggle when he grabbed Officer Danielson's wrist. The court scrutinizes the record as to whether Mr. Aragon tried to flee or actively resist.

The record evidence does not support the proposition that Mr. Aragon tried to flee from the Residence. To the contrary, Mr. Aragon refused to leave. He rebuffed officers' initial commands to exit.[154] When Robert tried to persuade him to surrender, Mr. Aragon again refused.[155] He remained in the bathroom even after officers fired the pepper balls and asked him to come out.[156] It is undisputed that Mr. Aragon did not "attempt[] to evade arrest by flight."[157]

Mr. Aragon's actions before officers entered the bathroom do not rise to the level of active resistance. Mr. Aragon refused to exit the home and the bathroom despite multiple requests and commands.[158] He sprayed water at the police robot and the home's walls and officers suspected he was damaging the home.[159] But getting angry, arguing with law enforcement, and merely failing to comply with officers' commands are not enough.[160]

On the other hand, the undisputed evidence shows Mr. Aragon actively resisted arrest once officers entered the bathroom. Officers put a shield over Mr. Aragon when they entered.

---

[152] R. & R. 24–27.
[153] Obj. to R. & R. 7.
[154] Collings Dep. 40:12–15.
[155] *Id.* at 40:16–23.
[156] *Id.* at 48:8–18; Collings Video 5:18 –5:27.
[157] *Graham*, 490 U.S. at 396.
[158] Collings Dep. 40:12–23, 48:8–9; Danielson Dep. 47:20–48:8; Collings Video 5:18–5:27.
[159] Collings Dep. 46:20–47:3 ('[T]he floor was soaking wet in the hallway that was carpeted . . . . At one point he entered into the bathroom, he held the shower nozzle out into the hallway and was spraying the robot and spraying the walls.").
[160] *McWilliams*, 40 F.4th at 1127.

But the fact that officers did so does not mean Mr. Aragon was incapable of "being violent[.]"[161] Defendants testified Mr. Aragon was "kicking, thrashing, rolling[,]"[162] and "kicking and punching at [officers]."[163] Officer Collings tried to gain control of Mr. Aragon's hands but was initially unable to do so.[164] He testified Mr. Aragon was "actively fighting."[165] Mr. Aragon grabbed Officer Danielson's wrist and started to pull the officer toward the bathtub.[166] Viewed in the light most favorable to Plaintiff, there is no genuine dispute that Mr. Aragon actively resisted.

Unlike *Surat*,[167] the facts show officers used force proportionate to Mr. Aragon's active resistance. Defendants observed Mr. Aragon kicking and thrashing, which prevented officers from gaining control of his hands. Mr. Aragon then grabbed Officer Danielson's wrist and started to pull him toward the bathtub. In response, Defendants struck Mr. Aragon until he let go.[168] Officers' actions were thus objectively reasonable.

### D.   Defendants' Actions Were Objectively Reasonable Despite Indications of Mr. Aragon's Diminished Mental Health.

The last factor concerns Mr. Aragon's mental health. The court may consider a suspect's mental health when assessing the use of force.[169] "[T]he problems posed by an unarmed,

---

[161] Obj. to R. & R. 7.

[162] Danielson Dep. 63:22–24.

[163] Collings Dep. 80:18–23 ("A. No, he was kicking and punching at us. Q. Why do you say he was punching at you? A. His arms were flailing back and forth after he sucked into the side. And I reached in and grabbed his arm. Then he rolled to his back, his arm came out. And he was either trying to push or swing.").

[164] *Id.* at 69:15–17 ("Q. Okay. So while you're on top of him and you're . . . *trying* to get ahold of his hands, and I presume the reason is to get him in handcuffs? A. Correct." (emphasis added)); *id.* at 70:15–18 ("Q. Okay. So . . . you're *trying* to grab his arms to get him in handcuffs, Officer Danielson . . . is trying to assist you in that effort, correct? A. (Witness nods head.)" (emphasis added)).

[165] *Id.* at 70:24.

[166] Danielson Dep. 64:4–11, 70:9–20; Danielson Video 6:25–6:26.

[167] *See Surat*, 52 F.4th at 1276 ("[T]he use of the takedown maneuver to slam to the ground a nonviolent misdemeanant who poses no immediate threat to the officer or others based on minimal resistance to arrest is unreasonable and constitutes excessive force under the Fourth Amendment.").

[168] Collings Dep. 71:6–20, 74:20–24, 110:15–16; Danielson Dep. 64:15–19, 78:23–79:3.

[169] *See Giannetti*, 216 F. App'x at 764.

emotionally distraught individual who is creating a disturbance are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal. . . . In the former instance, increasing the use of force may exacerbate the situation."[170] Yet "[a]uthorities must be allowed 'to graduate their response to the demands of any particular situation.'"[171]

The magistrate judge found the mental-health factor neutral.[172] Mr. Aragon contends the magistrate judge erred by not viewing his mental health as weighing against officers' reasonableness in applying force. Once again, the court reviews the evidence de novo.

Mental health is but one "part of the factual circumstances the court considers under *Graham*."[173] As discussed above, all three *Graham* factors support Defendants' use of force as objectively reasonable. The record evidence indicates Defendants knew Mr. Aragon was acting strangely.[174] Even so, a suspect's irrational behavior does not prevent officers from using force during a "tense, uncertain, and rapidly evolving" situation,[175] especially when a suspect's "actions cause the struggle to escalate."[176]

Defendants did not immediately resort to force to arrest Mr. Aragon. They first tried to command and coax him to leave the house.[177] In response, Mr. Aragon shut himself in the bathroom.[178] Officers then deployed pepper and asked him to come out.[179] Mr. Aragon still did

---

[170] *Cardall*, 845 F. Supp. 2d at 1192 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)).
[171] *Giannetti*, 216 F. App'x at 765 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985)).
[172] R. & R. 30.
[173] *Giannetti*, 216 F. App'x at 764.
[174] Danielson Dep. 48:4–8; Incident Report 6, 10; Collings Video 5:28–8:15; Danielson Video 5:42–7:00.
[175] *Giannetti*, 216 F. App'x at 765 (quoting *Graham*, 410 U.S. at 396–97).
[176] *Id.*
[177] Collings Dep. 40:12–23; 48:8–9; Danielson Dep. 47:20–48:8.
[178] Collings Dep. 46:22–47:3; Danielson Dep. 50:15–17.
[179] Officer Collings elected not to use a taser because it "would have harmed [Mr. Aragon]." Collings Dep. 48:11–18; *cf. Cardall*, 845 F. Supp. 2d at 1190–93 (finding as objectively unreasonable officers' use of a taser to subdue a suspect who "was naked and clearly unarmed, and outnumbered by the officers on the scene, who significantly outweighed him and were about to be joined by additional backup").

not comply.[180] When Defendants entered the bathroom and tried to apply handcuffs, he struggled with officers for over a minute.[181] Even then, Defendants did no more than try to immobilize and secure him.[182] Only when he grabbed Officer Danielson's wrist and started to pull the officer toward the bathtub did Defendants strike Mr. Aragon.[183] Yet Defendants stopped hitting him as soon as he released his grip.[184] In short, Mr. Aragon's "actions caused the struggle to escalate" despite his irrational behavior.[185] Based on the undisputed evidence, Defendants' actions were objectively reasonable. But since the record evidence also shows that Mr. Aragon presented signs of diminished mental capacity, the court finds this factor neutral.

The three *Graham* factors weigh in favor of Defendants and the mental-health factor is neutral. Mr. Aragon thus fails to raise a genuine dispute concerning Defendants' use of force.

## II. Mr. Aragon Does Not Show That Defendants Had Fair Notice That Their Actions Violated a Clearly Established Constitutional Right.

Under the qualified-immunity inquiry's second prong, a defendant must show that "the constitutional . . . rights the defendant allegedly violated were clearly established at the time of the conduct at issue."[186] The magistrate judge found Mr. Aragon failed to show that "punching an actively resisting subject was a violation of a clearly established right in 2014."[187] Mr. Aragon objects. He contends the magistrate judge erroneously based her conclusion on two disputed

---

[180] Collings Video 5:27–8:13.
[181] *See* Danielson Video 5:38–7:00; Collings Video 8:13–9:40.
[182] *See* Collings Dep. 63:23–70:4; Danielson Dep. 63:10–64:8; Collings Video 8:15–9:00.
[183] Collings Dep. 71:2–24, 74:7–9, 76:5–8; Danielson Dep. 64:16–18.
[184] Collings Dep. 71:6–20, 74:20–24, 110:15–16; Danielson Dep. 64:15–19, 78:23–79:3.
[185] *Giannetti*, 216 F. App'x at 765.
[186] *Wise*, 72 F.4th at 1208 (citation omitted).
[187] R. & R. 30.

facts: that he committed a severe crime and that he resisted arrest.[188] The court reviews the clearly-established prong de novo.

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."[189] "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[190] The corresponding "legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law[.]'"[191] In effect, "[t]he plaintiff must show there is a 'Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[192] There must be a "high 'degree of specificity.'"[193] "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'"[194] "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."[195] At bottom, the "salient question . . . is whether the state of the law in [2014] gave [Defendants] fair warning that [Mr. Aragon]'s alleged treatment was unconstitutional."[196]

---

[188] Obj. to R. & R. 8.

[189] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

[190] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[191] *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)).

[192] *Wise*, 72 F.4th at 1208–09 (citation omitted); *see Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022) ("[Courts] ask whether the existing law provides fair warning to a defendant.").

[193] *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix*, 577 U.S. at 13).

[194] *Id.* (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

[195] *Rivas-Villegas*, 142 S. Ct. at 8 (alteration in original) (quoting *Mullenix*, 577 U.S. at 12).

[196] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

There is no genuine dispute that Defendants responded to the Residence after reports of a serious crime: a burglary in progress. Defendants were informed that Mr. Aragon likely was armed with a knife, was violent, and was acting crazy. The homeowner, Mr. Aragon's mother, informed Defendants that she had a protective order against him and was fearful of him. It is further undisputed that Mr. Aragon actively resisted arrest, had in close proximity to him a hammer or mallet and a drill bit, and grabbed one of the officers.

Defendants identify no case law, controlling or otherwise, suggesting that every reasonable official would know that they were violating Mr. Aragon's constitutional rights by striking Mr. Aragon in the face and head until he let go of the officer's arm. In fact, the Objection cites no factually apposite case law on this point at all. For the sake of completeness, the court considers the cases Mr. Aragon cited in his opposition to the motion for summary judgment.

Mr. Aragon first cites to *McWilliams v. Dinapoli*.[197] The Tenth Circuit held that an officer "should have known that punching and tackling [the defendant] and using a chokehold, without a warning, would have violated the Constitution."[198] In finding a clearly established right, the court referenced a 2007 case, *Casey v. City of Federal Heights*,[199] which noted "that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."[200] Yet unlike here, in both *Casey* and *McWilliams*, officers suspected defendants of non-violent misdemeanors and neither defendant actively resisted arrest.[201]

---

[197] 40 F.4th 1118 (10th Cir. 2022).
[198] *Id.* at 1130.
[199] 509 F.3d 1278 (10th Cir. 2007).
[200] *Id.* at 1285.
[201] *See id.* at 1279–80 (an officer suspected defendant of leaving the courthouse with a file and the officer, "[w]ithout further explanation or discussion," grabbed the defendant and put him in an arm bar); *McWilliams*, 40

Next, Mr. Aragon relies on *Osterhout v. Morgan*[202] for the proposition that striking a suspect in the face is unconstitutional.[203] But the defendant in *Osterhout* did not resist arrest. The court found that the officer "without warning hit [the defendant] in the face" and then kneed him several times in the ribs after the defendant "stood up with his hands in the air, fac[ed] the patrol car and [was] blinded by its head lights."[204] The court in *Osterhout* referenced *Morris v. Noe*,[205] where a defendant "put his hands up and started backing toward . . . officers" when officers "lunge[d] towards [the defendant] and put their hands on his shoulders, twisted him around and ran him into the bushes . . . throwing him to the ground."[206] Here, Defendants hit Mr. Aragon only when he grabbed Officer Danielson and started to pull the officer toward the bathtub.

Mr. Aragon also argues *Olsen v. Layton Hills Mall*[207] and *Vette v. K-9 Unit Deputy Sanders*[208] established pre-2014 that an officer acts unconstitutionally when he "strik[es] a nonviolent misdemeanant who did not pose an immediate threat."[209] But again, officers in these cases used force against nonviolent and non-resisting misdemeanant suspects. In *Olsen*, an officer slammed a suspect against a glass window and pulled the suspect's arm behind his back "in an awkward position" after the suspect's muscles "automatically tensed up[.]"[210] In *Vette*, officers had already secured the defendant when an officer punched and hit the defendant in the

---

F.4th at 1122 (defendant suspected of trespassing and the officer "punched, tackled, and used a chokehold" on the defendant despite him posing "little or no threat" to officers).
[202] 763 F. App'x 757 (10th Cir. 2019) (not selected for publication).
[203] Opp'n 28.
[204] *Osterhout*, 736 F. App'x at 759.
[205] 672 F.3d 1185 (10th Cir. 2012).
[206] *Id.* at 1190 (first alteration in original).
[207] 312 F.3d 1304 (10th Cir. 2002).
[208] 989 F.3d 1154 (10th Cir. 2021).
[209] Opp'n 29.
[210] *Olsen*, 312 F.3d at 1310.

face with a dog chain and let a police dog attack him.[211] Here, Defendants reasonably believed Mr. Aragon was committing a serious offense, was violent, and may be armed.[212] And Mr. Aragon's actions were not nonviolent. He was "kicking [and] thrashing[.]"[213] He was pushing on the police shield and rolling toward the hammer and drill bit.[214] And he grabbed Officer Danielson's wrist and tried to pull him toward the bathtub.[215] Defendants punched Mr. Aragon, but only until Mr. Aragon released his grip.[216]

Mr. Aragon has failed to demonstrate that Defendants had fair notice that striking a person suspected of committing a dangerous felony, reportedly having weapons, and actively resisting officers violated that person's constitutional rights. Mr. Aragon cannot satisfy the clearly-established prong, and he fails to overcome Defendants' qualified immunity defense. Defendants are thus entitled to summary judgment.

## ORDER

For the forgoing reasons, the court OVERRULES Plaintiff's Objection to Report and Recommendation.[217] The Report and Recommendation is ADOPTED.[218] The court GRANTS Defendants' Second Motion for Summary Judgment.[219]

---

[211] *Vette*, 989 F.3d at 1159.
[212] Collings Dep. 48:3–4, 60:8–12, 76:19–21; Danielson Dep. 42:7–11; 46:19–47:8.
[213] Danielson Dep. 63:22–24.
[214] Collings Dep. 63:7–64:2, 66:17–19, 69:8–9; Danielson Dep. 64:1–3.
[215] Collings Dep. 64:4–11, 70:9–20; Danielson Video 6:25–6:26.
[216] Collings Dep. 71:6–20, 74:20–24, 110:15–16; Danielson Dep. 64:15–19, 78:23–79:3.
[217] ECF No. 129.
[218] ECF No. 128.
[219] ECF No. 114.

Signed August 15, 2023.

BY THE COURT

_____

David Barlow
United States District Judge